[No. E010924. Fourth Dist., Div. Two. Feb. 24, 1994.]

KIM BRO et al., Plaintiffs and Appellants, v.
JOSEPH GLASER, Defendant and Respondent.

**COUNSEL**

Russell J. Thomas, Jr., for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre and Therese K. Twomey for Defendant and Respondent.

**OPINION**

**McDANIEL, J.***—While performing a caesarean section on Donna Bro, her obstetrician nicked the cheek of baby Brittany Bro with his scalpel. There was no permanent physical injury to the baby; nevertheless, the parents

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.

commenced the underlying litigation against the doctor, seeking, on behalf of their baby daughter, to recover for medical malpractice and, for their own account, to recover emotional distress damages, arising because of the allegedly negligent manner in which their child was "presented" to them about 30 minutes after her birth.

Because defendant doctor was later wholly absolved of any medical malpractice (*infra*), this appeal presents for decision whether plaintiff parents are entitled to recover damages for negligent infliction of *purely emotional distress* where such claim stands alone, i.e., there being no adjunct or concurrent claim, tort or otherwise.

Within the scheme of our analysis and reflecting current authority, Kim Bro, the father, and Donna Bro, the mother (plaintiffs), qualify as "direct victims" because of their "preexisting relationship" with Joseph Glaser, M.D. (defendant). (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1074 [9 Cal.Rptr.2d 615, 831 P.2d 1197] [*Burgess*].) Despite plaintiffs' being direct victims, their claim for negligent infliction of emotional distress was rejected by the trial court and rightly so, as we shall explain, when it granted defendant's motion for summary judgment on that count.

In seeking a rationale for deciding this appeal, we analyzed a number of post-*Molien*[1] emotional distress cases. The data which such analysis produced, as collected in the appendix, suggests a specific test for use in approaching the daunting task of deciding purely emotional distress cases, where, according to Justice Puglia, ". . . the effort to force disparate cases with a loose family resemblance into a tight, coherent, conceptual scheme has bedeviled this area of decisional law." (*Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 8 [4 Cal.Rptr.2d 87] [*Merenda*].) The test, which the data above noted suggests, is a reflection of Justice Tobriner's recital in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] (*Dillon*) that duty " 'is a shorthand statement of a conclusion [that liability shall attach if it be breached], rather than an aid to analysis in itself. . . .' " (*Id.* at p. 734.) Similarly, the test, which the data suggests, is an application of Justice Eagleson's admonition in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] (*Thing*), confirmed in *Burgess*, that foreseeability is "not a useful 'guideline' " in defining the presence of duty in purely emotional distress cases. (*Burgess, supra*, 2 Cal.4th 1064, 1074.)

In other words, in all purely emotional distress cases, it is always foreseeable that the plaintiff will be distressed; as a result, if duty were to depend

---

[1]*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] (*Molien*).

primarily on foreseeability, as in personal injury cases, recovery would be automatic in every emotional distress case. However, as Justice Blease observed in *Andalon v. Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899] (*Andalon*), " ' "[n]ot every [emotional distress] loss can be made compensable in money damages, and legal causation must terminate somewhere. In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially *political*." ' " (*Id.* at p. 607, original italics.)

Thus, in an effort to respond to the invitation, implied in *Andalon*, we shall prescribe, as an aid in deciding emotional distress cases based on negligence, a two-pronged test for use in screening the cases and then for locating that line between liability and nonliability in those cases.

When the prescribed test, which we distilled from *Burgess* and the catalogue of the 26 post-*Molien* cases studied, is applied to the undisputed facts presented by the record before us here, it results in a ready showing that the trial court properly granted defendant's motion for summary judgment. We shall affirm the judgment accordingly.

### Synopsis of Trial Court Proceedings

As above related, plaintiffs' complaint was styled in two counts. The first alleged medical malpractice by three doctors, including defendant, in that while defendant was performing a caesarean section on plaintiff Donna Bro, "the left side of Plaintiff Brittany Bro's face was severely lacerated." The second was designed to recover for plaintiff parents' purely emotional distress, arising "[a]s a proximate result of Defendants['] *negligent and careless presentation* of newborn Brittany to Plaintiffs [who] . . . observed their daughter Brittany with a laceration and bandage to her face and [thereby] suffered severe emotional distress." (Italics added.)

The record on appeal contains no appearances in the trial court by any of the defendants. However, the record does show that, about eight months after plaintiffs' complaint was filed, defendant gave notice of motion for summary adjudication of issues arising by reason of the second count, i.e., plaintiffs' count for purely emotional distress suffered because of the allegedly careless manner in which their newborn daughter was *presented* to them. The motion was made on the ground that "There is no triable issue of fact as to whether plaintiff Kim Bro can recover on a bystander theory of Negligent Infliction of Emotional Distress, and, accordingly, the Second Cause of Action as to Kim Bro [should be] dismissed with prejudice." A similar ground was also articulated as to plaintiff Donna Bro.

Defendant's supporting statement of material facts was compiled in light of his theory that plaintiffs did not qualify as traumatized family bystanders. In sum, the statement asserted that it was undisputed that each of plaintiff parents was seeking emotional distress damages "based upon the observance of *the aftermath* of [defendant's] alleged negligence." (Italics added.) In the instance of plaintiff father, the statement further asserted that he "was not aware that defendant DR. GLASER was causing injury to Brittany Bro at the time the injury was taking place."

In further support of his motion, defendant lodged the depositions of both plaintiff parents with the court. In his points and authorities, defendant quoted excerpts of both depositions. A fair summary of the critical events, as disclosed by these excerpts shows: 1) plaintiff mother's vision of the caesarean section procedure was screened, and she did not learn of the cut on Brittany's cheek until she (the mother) was in the recovery room; 2) it was in the recovery room that defendant told both parents, about half an hour after it happened, that the child's cheek had been cut during the delivery procedure; 3) although plaintiff Kim Bro was present during the caesarean section procedure, he likewise did not see the child's cheek cut; 4) up until the time defendant told the parents that he had cut their baby's face, the parents did not suspect that the delivery had involved a minor mishap.

In plaintiffs' opposition to the motion, defendant's response to a particular written interrogatory was cited; it stated, "admit that BRITTANY BRO sustained a small cut from the scalpel on her left cheek."

In their points and authorities, plaintiffs quoted certain paragraphs of their complaint to pinpoint the precise predicate for the cause of their emotional distress. Those paragraphs alleged: "On December 14, 1989, immediately after Plaintiff BRITTANY BRO's face was lacerated, Defendants and each of them negligently and carelessly presented the newborn BRITTANY BRO to Plaintiff[]s and parents KIM and DONNA BRO. At the time injured newborn BRITTANY BRO was presented to Plaintiff[]s KIM and DONNA BRO, BRITTANY BRO's face had been severely lacerated and bandaged by Defendants. [¶] As a proximate result of *Defendants' negligent and careless presentation of newborn BRITTANY to Plaintiffs* and parents KIM and DONNA BRO, KIM and DONNA observed their daughter BRITTANY with a laceration and bandage to her face and suffered severe emotional distress." (Italics added.)

Based on these allegations, plaintiffs argued, in their opposition to the motion, that they were "direct victims" of defendant's negligent "presentation" and that their theory of liability was based on such status and not that of traumatized family bystanders. Again, plaintiffs noted a particular allegation in their complaint: "On December 14, 1989, *immediately after* Plaintiff

BRITTANY BRO's face was lacerated, Defendant . . . negligently and carelessly presented the newborn BRITTANY BRO to Plaintiff[]s." (Original italics.)

In plaintiffs' statement of disputed and undisputed facts, they limited their recitals to insisting that they were "alleging a Direct Victim Theory of recovery *based upon the negligent presentation of BRITTANY BRO to KIM and DONNA BRO*. Plaintiffs are not alleging a bystander theory of recovery." (Italics added.)

In his reply to plaintiffs' opposition to his motion, defendant cited to and quoted additional excerpts from plaintiffs' respective deposition testimony. In sum, they show: 1) the baby's face was bandaged when it was "presented" to plaintiffs; 2) the "presentation" occurred about five minutes after defendant related to plaintiffs that the baby's face had been cut; 3) plaintiff mother stated that she expected the baby's face to be bandaged when it was handed to her; 4) she also affirmed that she "would have wanted the doctor[] to repair whatever cut there was to the face, . . ."; 5) plaintiff mother further affirmed that she had "no criticism [of] the way in which [defendant] conducted himself after the delivery, . . ."

After the motion was argued and submitted, the trial court entered its order granting the motion for summary adjudication "of the second cause of action as to [both] plaintiffs KIM and DONNA BRO . . ." and directing that judgment be entered thereon in favor of defendant. The only reason stated for granting the motion was that the "second cause of action as to plaintiffs KIM and DONNA BRO has no merit and that there is no triable issue of any material fact with respect thereto. . . ."[2]

There are two possible reasons for the court's ruling. If it were persuaded to accept defendant's position that the only possible theory of liability was the *Dillon*, family-bystander theory, then its decision could be rationalized on the ground that neither parent actually witnessed the injury inflicted on baby Brittany. Thus, neither could have qualified as a traumatized family bystander. However, if the trial court were persuaded to accept plaintiffs' position that they were claiming emotional distress damages as so-called direct victims, having both retained defendant to be "a participant in the reproductive life of the marital couple" (*Andalon, supra*, 162 Cal.App.3d 600, 611), then the decision can be rationalized as holding, *despite plaintiffs' qualifying as direct victims*, that defendant's conduct in "presenting" the child to plaintiffs did not breach a duty under which they enjoyed a protected interest in being free from negligent infliction of emotional distress (*infra*).

---

[2]This constitutes the barest, minimal compliance with subdivision (g) of section 437c of the Code of Civil Procedure.

Under no possible analysis is this a traumatized family bystander case. Thus, either the trial court correctly decided the case under the latter alternative above described, or the result can rest on *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], where the Supreme Court confirmed that "[n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason." (*Id.* at p. 19.)

Otherwise, there was some procedural confusion arising by reason of plaintiffs' notice of appeal which showed that plaintiffs did not undertake to appeal from the actual judgment by which the litigation, as to plaintiffs personally, was terminated in the trial court. As a result, we called up the entire trial court file and, on our own motion, elected to take judicial notice thereof. (Evid. Code, § 459.) Based on such notice, the record has been expanded to show that count one of plaintiffs' complaint, alleging defendant's medical malpractice as to baby Brittany Bro, was likewise resolved by means of a summary judgment *entered in defendant's favor*.

Yet otherwise, the confusion over our appellate jurisdiction has been resolved in favor of our going ahead, the same by reason of our order of November 30, 1993. We shall therefore deem the appeal to have been timely taken from the judgment of January 30, 1992.

Discussion

I.

*The Summary Judgment Framework*

In the first instance, we are reminded that this appeal is from a summary judgment. The well-established rules for resolving motions for summary judgment are found in Code of Civil Procedure section 437c. The same standard applies in reviewing such judgments on appeal. " 'Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue.' [Citation.]" (*Golden West Broadcasters, Inc.* v. *Superior Court* (1981) 114 Cal.App.3d 947, 954 [171 Cal.Rptr. 95].) Only if the moving party first demonstrates that its declarations, " '. . . considered in light of the issues raised by the pleadings . . . would, standing alone[,] support the summary judgment motion[,] does the court look to any

counteraffidavits and counterdeclarations.'" (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445].)

Once the court has considered the filings before it and found that there were no triable issues of disputed fact, its ruling on the motion for summary judgment becomes a determination of a question of law which the court must make. (*Shields* v. *County of San Diego* (1984) 155 Cal.App.3d 103, 108 [202 Cal.Rptr. 30]; Code Civ. Proc., § 437c.)

What is often overlooked is that the factual issue guidelines for motions for summary judgment are precisely fixed by reference solely to the pleadings. (*Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 994 [216 Cal.Rptr. 796].)

As suggested by *City of Turlock*, any review of a summary judgment begins with a *careful scrutiny of the pleadings*. Although defendant's motion for summary judgment attempted to impose a theory upon plaintiffs' complaint which did not fit, that complaint nevertheless does provide the framework within which to determine the motion.

Turning to count two of the complaint, to which defendant's motion was directed, although negligence as the proximate cause of their emotional distress was alleged in conclusionary terms, such count probably could have survived demurrer. Even so, within the summary judgment framework, defendant's evidentiary showing in support of the motion demonstrated a prima facie case of nonliability. Plaintiffs' opposition raised no material issue of fact over what had occurred. Thus, the trial court's task evolved into deciding, as a matter of law, whether the manner in which plaintiffs' newborn daughter was "presented" to them, i.e., with a bandage on her cheek, did or did not entitle plaintiffs to recover damages for purely emotional distress. More particularly, in terms of the test to be developed (*infra*), the trial court was called upon to decide whether defendant's conduct was sufficiently *outrageous*, as a policy matter, to cross the *Andalon* line and hence call for imposition of liability.

*Plaintiffs' Contentions*

In pursuing their appeal, plaintiffs, in their initial bold face type "argument" contend that the judgment on count two "should be vacated since plaintiffs have stated a cause of action under the direct victim theory of liability and there are genuine issues of fact that remain for resolution at

trial." In their argument immediately following the above contention, plaintiffs invoke *Burgess*, which they interpret to have "clarified the rights of parents to assert claims against physicians for negligent conduct arising out of child[]birth;" they nevertheless abruptly abandon that position by asserting in their brief that "[t]he second cause of action does not focus on the surgery itself but *upon the separate act of the manner in which the injured child was presented to the parents after her birth*." (Italics added.) To reinforce this latter assertion as the basis for their theory of liability, plaintiffs quote from their complaint, as earlier noted. In short, plaintiffs' avowed grievance *is not related to the manner in which the childbirth was accomplished*, but rather is related to the manner in which baby Brittany was "presented" to them 30 minutes later.

In our view, the trial court accepted plaintiffs' contention that they qualified as direct victims per *Burgess*. However, it rejected their simplistic argument that merely qualifying as direct victims entitled them ipso facto to recover emotional distress damages. The clear implication is that the trial court ruled that plaintiffs, in order to recover, had to show *something more* than that they were direct victims; defining this *something more* is what much of this opinion is about.

In this regard, we are constrained to reiterate that defendant was absolved of any negligence in his delivery of baby Brittany. Thus, if plaintiffs have any colorable claim for emotional distress damages, it cannot be analogized to what happened in *Burgess* where the plaintiff mother was held entitled to recover parasitic or *adjunct* emotional distress damages along with the damages for the wrongful death of her child which resulted from the medical malpractice. (*Post.*)

## II.

### *Evolution of Direct Victim Definition*

 As current law appears to us, reflected in the table attached as an appendix, to recover damages for purely emotional distress in nonbystander cases, it is first necessary to be a direct victim. Thus, it is important if not imperative to seek the origins of the definition and to trace its evolution. In our view, the story begins with *Amaya v. Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513] (*Amaya*) and continues through *Dillon, Molien, Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278] (*Marlene F.*), and *Thing*, and culminates in *Burgess*.

## A.

### *Amaya*

For well over a century, after the common law first recognized a cause of action based on negligence, the policy basis for such action was to sanction recovery of damages to compensate victims of negligence for their out-of-pocket losses arising because of personal injury which resulted in medical expenses and loss of wages. In most jurisdictions, this recognition was coupled with the requirement of physical impact as essential to such a cause of action. Just over 30 years ago, our Supreme Court was squarely faced with the question of whether this proposition applied in California. In *Amaya*, a four-to-three decision, the court observed, "At the outset it is necessary to determine whether or not the 'impact rule' is in force in California: i.e., in an action for personal injuries resulting from the internal operation of negligently induced fright or shock, need the plaintiff show that there was some contemporaneous physical impact upon her person? [Citation.] . . . No California decision has been found declaring such a requirement, and we are not disposed to introduce it into our law now. We hold, accordingly, that plaintiff's failure to allege a contemporaneous physical impact upon her person is not, of itself, fatal to her attempt to state a cause of action." (59 Cal.2d at p. 299, fn. omitted, citing *Cook* v. *Maier* (1939) 33 Cal.App.2d 581, 584-585 [92 P.2d 434].) However, the court went on to rule that the plaintiff *could not state a cause of action for her emotional distress and consequent physical injury* because she had not been in the zone of danger when she saw her infant son struck by the defendant's ice truck.

Otherwise, *Amaya* confirmed the necessity for proximately caused *physical symptoms* in order to state a cause of action. This requirement is an integral part of the so-called zone-of-danger cases, where, despite the absence of impact, there are discernable and deleterious *physical symptoms* suffered by the plaintiff because of the "close call."[3] For our purposes, *Amaya* represented a serious brush with the concept of allowing money damages for purely emotional distress without physical injury.

---

[3]An interesting variation on this theme was present in *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115]. In *Vanoni*, the plaintiffs in graphic terms alleged that defendant had "so carelessly and negligently maintained, owned, operated and controlled the aforesaid aircraft so as to lead plaintiffs . . . to believe that said aircraft was going to crash; . . ." (*Id.* at p. 794.) Plaintiffs further alleged that the experience had caused "great grievous mental suffering, anguish and anxiety and . . . *severe shock to his [their] nerves and nervous system. . . .*" (*Ibid.*, italics in original.) A general demurrer was sustained in the trial court, and, in reversing, the reviewing court held that the last quoted language was sufficient to allege *a physical injury.* In this connection, the court observed (as of 1967) that "[i]t seems to be the law that there can be no recovery for emotional distress . . . unaccompanied by physical harm arising from acts which are solely negligent in nature." (*Id.* at p. 795.)

## B.

### *Dillon*

Seven years after *Amaya*, and after the composition of the Supreme Court had changed, in *Dillon*, another four-to-three decision, the Supreme Court overruled *Amaya*, creating liability for negligence in favor of the emotionally traumatized family bystander positioned outside the zone of danger. By so ruling, *Dillon* represented a sharp break from the traditional limits of tort liability based on negligence. It awarded damages for purely emotional distress after more than a century of precedent which required accompanying physical injury. This newly defined liability was justified wholly on policy grounds but was rigidly limited to close family members actually witnessing the traumatic event. (*Dillon, supra,* 68 Cal.2d 728, 741.)

*Dillon* set forth three factors for use in making a determination of whether the accident and harm to the plaintiffs were reasonably foreseeable: "(1) Whether the plaintiff was located near the scene of the accident . . . (2) Whether the shock resulted from . . . [plaintiff's] sensory and contemporaneous observance of the accident . . . (3) Whether plaintiff and the victim were closely related . . . ." (*Dillon, supra,* 68 Cal.2d 728, 740-741.)

The foregoing represented implementation of the notion that duty is "only an expression of the sum total of those considerations of policy which lead the law to say that [certain plaintiffs are] entitled to protection [from negligent infliction of emotional distress]." (*Dillon, supra,* 68 Cal.2d 728, 734.) Otherwise, the court observed it was not called upon to decide the necessary degree of foreseeability to fix liability in cases where the conditions above noted were not present. Instead it stated that "[i]n future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us." (*Dillon, supra,* 68 Cal.2d 728, 741.)

## C.

### *Molien*

Such facts were presented to the Supreme Court twelve years later in *Molien*, a five-to-two decision. There, a Kaiser staff physician diagnosed the plaintiff's wife as having syphilis, and instructed her to inform her husband. When it was later discovered that the diagnosis was incorrect, the husband sued the physician and Kaiser, alleging that "[a]s a result of the negligently erroneous diagnosis, plaintiff's wife became upset and suspicious that he had

engaged in extramarital sexual activities and, as a result, he "suffered extreme emotional distress." (*Molien, supra,* 27 Cal.3d 916, 920.) The defendants demurred, contending the suit was barred by *Dillon,* because the husband had not been present when the doctor announced the diagnosis and hence was not a traumatized family bystander.

In reversing the trial court's judgment of dismissal, the *Molien* court discounted the relevance of the *Dillon* theory, yet reasoned that *Dillon* was "apposite" because it applied the general principles of foreseeability, but not controlling because the plaintiff in *Molien* was not a "percipient witness" of the claimed negligent act, but instead was a "direct victim" thereof. (*Molien, supra,* 27 Cal.3d 916, 921-923.) The *Molien* court did not define "direct victim," other than to say the risk of harm to the plaintiff from an erroneous diagnosis of syphilis was "reasonably foreseeable" and that ". . . the alleged tortious conduct of defendant was directed to [plaintiff] as well as to his wife." (*Id.* at p. 923.)

*Molien*'s further departure from existing precedent, i.e., beyond *Dillon,* which was not even commented upon except in the dissent (*post*), lies in its willingness to award money to a plaintiff, in a negligence case, where there had been no monetary loss suffered either by reason of physical injury or otherwise. In this respect, *Molien* launched the courts on to a wholly uncharted sea without bearings or distances for fixing "a money award against one who unintentionally disturbs the mental tranquillity of another." (*Molien, supra,* 27 Cal.3d 916, 933 (dis. opn. of Clark, J.).)

Soon after *Molien* loosed the floodgates of liability for emotional distress without accompanying physical injury, it became apparent to the intermediate courts that attempting to define duty and its breach, as they were accustomed to doing it in personal injury cases, was just not workable in purely emotional distress cases. Since *Molien,* as noted by Justice Puglia in *Merenda (ante),* the cases have proceeded without a uniform, orderly scenario by which such cases could be evaluated and decided in a prescribed, precedent-sanctioned manner. Despite this absence of uniformity, the most telling observation to be made of the post-*Molien* cases analyzed is that more have held against liability than for it (see appen.), indicating that the courts, in a majority of the post-*Molien* cases, have managed, one way or another, to find that elusive line referred to in *Andalon, supra,* 162 Cal.App.3d 600, 607.

In other words, common sense and practical necessity would not tolerate unlimited access to the legal system to anyone seeking to recover money from another who had unintentionally disturbed only the former's mental tranquility, to paraphrase language quoted above from Justice Clark's dissent

in *Molien, supra,* 27 Cal.3d 916, 933. Thus, some manner of threshold screening of such cases was implicitly recognized. *Molien* itself provided the initial, limiting language of "direct victim," without defining such victim other than in terms of reasonable foreseeability.

### D.

#### *Marlene F.*

About nine years after *Molien* was decided, the Supreme Court granted review in *Marlene F.* to address the question of whether "the mother of a minor child [can] state a claim for the negligent infliction of emotional distress against the psychotherapist who, consulted to treat both mother and son, sexually molested the boy. . . ." (*Marlene F., supra,* 48 Cal.3d 583, 585.) Writing for a four-to-three majority on the emotional distress issue, Justice Arguelles said ". . . we hold she can." (*Ibid.*)

The litigation which ensued involved two mothers and their respective teenage sons who had gone to the defendant clinic for counseling to relieve perceived psychological problems in the two mother-son relationships. Thereafter, both the boys were sexually molested. This precipitated two actions which were later consolidated. As recited in the opinion, "[a]ll defendants successfully demurred to this cause of action. The Court of Appeal affirmed, acknowledging that the mothers had suffered from the mistreatment of their children but reasoning that they failed to state a claim under either the 'bystander witness' theory of *Dillon* [citation] or the 'direct victim' theory of *Molien* [citation], because they were neither present at the time the torts were committed nor the actual targets of the therapist's unprofessional conduct." (*Marlene F., supra,* 48 Cal.3d 583, 588.)

The Supreme Court reversed the judgment of the Court of Appeal, directing it to enter judgment reversing the trial court's order sustaining defendants' demurrers to the pertinent counts. (*Marlene F., supra,* 48 Cal.3d 583, 592.) In rationalizing the result it reached, the majority, after noting that the plaintiff husband in *Molien* was deemed a "direct victim" (*id.* at p. 589) and that in *Molien* ". . . our decision did not, however, purport to create a cause of action for the negligent infliction of emotional distress based solely upon the foreseeability that serious emotional distress might result" (*ibid.*), sought to match the plaintiff in *Marlene F.* to the plaintiff in *Molien.* In this respect, *Marlene F.* stated, "[i]n other words, the counseling was not directed simply at each mother and son as individuals, but to both in the context of the family relationship. And the complaint alleged that the discovery by the mothers of the therapist's sexual misconduct caused them serious emotional

distress, further disrupting that family relationship." (*Id.* at p. 590.) To leave no doubt as to how it perceived the predicate for the breach of duty involved, the majority stated that "[i]t bears repeating that the mothers here were the patients of the therapist along with their sons, and the therapist's tortious conduct was accordingly directed against both. They sought treatment for their children—as they had the right, and perhaps even the obligation, to do—and agreed to be treated themselves to further the purposes of the therapy. They were plainly entitled to recover for the emotional distress they suffered." (*Id.* at p. 591, fn. omitted.)

Despite the characterization of the respective roles of the parties, *Marlene F.* never expressly labeled the plaintiff mothers as "direct victims." It was content to adopt a holding that "[d]amages for severe emotional distress, rather, are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, *or that arises out of a relationship between the two.*" (*Marlene F.*, *supra*, 48 Cal.3d 583, 590, italics added.)

Justice Eagleson, with Chief Justice Lucas and Justice Panelli joining him, wrote separately, concurring only in the judgment. He stated flatly, "I do not, however, agree that a 'direct victim' theory of liability or *Molien* [citation], has any relevance to the plaintiffs' right to recover. The conclusion of the trial court that the mothers had not stated a cause of action under *Molien* was correct. The court erred only in failing to recognize that the allegations of the complaint did state a cause of action for professional malpractice." (*Marlene F.*, *supra*, 48 Cal.3d 583, 599.) Expanding upon the foregoing position, Justice Eagleson declaimed further that "[t]he majority's reliance on *Molien*, in this case, and its suggestion that permitting recovery is somehow novel although not a 'dramatic step' are inexplicable. The explanation in *Molien* that the plaintiff was a 'direct victim' did no more than distinguish and explain why the *Molien* plaintiff had not stated a cause of action as a 'bystander' victim whose emotional distress injury was caused by observation of an injury to another. [Citation.] Identification of the plaintiff as a 'direct victim' of the defendant's negligence did not, however, explain the source of the duty which obligated the defendant for emotional distress damages—recovery which is normally permitted only as an item of 'parasitic' damages when the defendant is liable for another injury. The majority's explanation here that the therapist's 'tortious conduct' was directed at both the children and their mothers suffers from the same defect. It does not identify any tort other than negligence that supports the recovery of damages for emotional distress, and thus supports negligent infliction of emotional distress as an independent cause of action." (*Marlene F.*, *supra*, 48 Cal.3d 583, 600, citing *Dillon.*)

E.

*Thing*

Just 13 days after *Marlene F.* was handed down, the Supreme Court issued its opinion in *Thing.* There, a child was seriously injured when struck by defendant while driving his automobile. The plaintiff mother did not see the actual impact but learned of it soon afterward and then witnessed her son lying unconscious in a bloody heap. In the litigation which followed, the mother pursued a *Dillon* theory but was thwarted by the defendant's successful motion for summary judgment. The Court of Appeal reversed and was in turn reversed by the Supreme Court, which reinstated the judgment for the defendant driver.

In holding against liability, the Supreme Court, in a split decision, reaffirmed the limited and specific *Dillon* criteria applicable in cases involving an emotionally traumatized family bystander, and criticized *Molien* for "neither establish[ing] criteria for characterizing a plaintiff as a 'direct victim' nor explain[ing] the justification for permitting 'direct' victims to recover when 'bystander' plaintiffs could not." (*Thing, supra,* 48 Cal.3d 644, 658.) Continuing, Justice Eagleson kept up his unrelenting attack on *Molien* in observing, however, that, "[t]he immediate effect of the decision, however, was to permit some persons who had no prior relationship with the defendant that gave rise to a duty, who did not suffer physical injury as a result of emotional distress, who did not observe the negligent conduct, and who had not been at or near the scene of the negligent act to recover for emotional distress on a pure foreseeability-of-the-injury basis. The limitations on recovery for emotional distress that had been suggested in the *Dillon* 'guidelines' were not applicable to 'direct' victims of a defendant's negligence." (*Thing, supra,* 48 Cal.3d 644, 658-659.)

For our purposes, *Thing* is a *tour de force* in commenting on the subject of negligent infliction of emotional distress. More particularly, it is useful in a manner similar to that in which we have invoked *Dillon.* While *Dillon* was at pains to instruct that *duty* is a shorthand label to be affixed after a policy decision has been made that liability shall attach (*Dillon, supra,* 68 Cal.2d 728, 734), *Thing* is a similar exercise in discrediting any meaningful significance of *foreseeability* (relied upon in *Molien, ante*) as a predicate for determining duty in purely emotional distress cases. (*Thing, supra,* 48 Cal.3d 644, 663-664.)

In the section of the opinion entitled "Clarification of the Right to Recover for NIED" (negligent infliction of emotional distress), Justice Eagleson

states, "[t]he *Dillon* experience confirms, as one commentator observed, that '[f]oreseeability proves too much. . . . Although it may set tolerable limits for most types of physical harm, *it provides virtually no limit on liability for nonphysical harm.*' " (48 Cal.3d at p. 663, italics added.) He then delivers the *coup de grâce* in stating that, "[i]t is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury." (*Thing, supra,* 48 Cal.3d 644, 664.) In view of the foregoing, we cannot resist recalling that Witkin is oft wont to lyricize, in the course of his many and storied public orations, "on a clear day some courts can foresee forever."

F.

*Burgess*

The *Thing* court's repudiation of foreseeability in emotional distress cases was echoed three years later in *Burgess.* In *Burgess,* after the plaintiff mother went into labor at a lying-in hospital, Dr. Gupta, the real party, detected a prolapsed umbilical cord, i.e., the cord was strangling the child. Before an emergency caesarean section could be performed, the child was deprived of an adequate oxygen supply for about 44 minutes. Such deprivation caused permanent brain damage. In the litigation which followed, in addition to suing for alleged medical malpractice, the mother sought damages for negligent infliction of emotional distress. The child died during the initial stage of the litigation, and the suit for wrongful death action later filed was consolidated with the earlier action.

Dr. Gupta moved for summary adjudication of the count for negligent infliction of emotional distress. The trial court granted the motion, treating the case as one involving a traumatized family bystander who had failed to meet the criteria for recovery on that theory. The mother's writ petition, challenging the trial court order, was granted by the Court of Appeal; thereafter, the Supreme Court elected to grant review, "in order to address the recurring question of whether a mother can recover damages for the emotional distress suffered as a result of a negligent delivery causing injury to her child." (*Burgess, supra,* 2 Cal.4th 1064, 1071.)

The Supreme Court ruled that the mother was not a bystander but "may state a claim for [adjunct] damages for serious emotional distress arising from the negligent delivery of her child." (*Burgess, supra,* 2 Cal.4th 1064, 1085.) After excluding from the mother's prospective recovery any amounts for loss of filial consortium, the court went on to state that the mother's recovery was limited to damages for her emotional distress arising "from the

'abnormal event' of participating in a negligent delivery and reacting to the unexpected outcome of her pregnancy with resulting ' "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, as well as physical pain." ' " (*Id.* at pp. 1084-1085.)

Although it was presented with the occasion to overrule *Molien* and thereby to roll back the boundaries of liability for purely emotional distress to the *Dillon* perimeter, the Supreme Court declined to do so.[4] Instead, in *Burgess* it observed that, "The great weight of this criticism [of *Molien*] has centered upon the perception that *Molien* introduced a new method for determining the existence of duty, limited only by the concept of foreseeability. To the extent that *Molien* . . . stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts." (*Burgess, supra,* 2 Cal.4th 1064, 1074.)

After this mild criticism of *Molien*, the *Burgess* court, as earlier noted, *pointedly discounted foreseeability* as a meaningless guideline for measuring duty in this kind of case (*Burgess, supra,* 2 Cal.4th 1064, 1074), and then concluded nevertheless that ". . . other principles derived from *Molien* . . . are sound: (1) damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases *where a duty arising from a preexisting relationship is negligently breached.*" (*Id.* at p. 1074, italics added, citing *Marlene F.*) In sum, *Burgess* reaffirmed the *Molien* seminal pronouncement that actions by direct victims of negligently inflicted emotional distress are viable. (*Burgess, supra,* 2 Cal.4th 1064, 1074.)

More important and providing the linchpin to our analysis, *Burgess* at last delivered the sorely needed pronouncement which defined a "direct victim" as used in *Molien* but not therein defined. *Burgess* stated that *the presence of a preexisting relationship between the parties* is that "which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess, supra,* 2 Cal.4th 1064, 1074.)

Parenthetically, with reference to the language "preexisting relationship," the facts in *Burgess* reflect that such relationship had been *consensual.* As a result, we could only conclude, when the *Burgess* court referred to a

---

[4] Similarly in *Thing*, the majority declined Justice Kaufman's invitation to overrule *Dillon.* In his concurring opinion in *Thing*, he stated, "[t]he interest in freedom from emotional distress caused by negligent injury to a third party is simply not, in my view, an interest which the law can or should protect." (*Thing, supra,* 48 Cal.3d 644, 676.)

"preexisting relationship" as necessary for there to have been *a direct victim* of a defendant's negligence in purely emotional distress cases, that the court implied that such relationship had to be *consensual*. This refinement of the definition is justified because it reflects the actual nature of the relationships which existed in *Burgess* as well as in *Marlene F.* and in a substantial number of post-*Molien* authorities dealing with whether there should be an award of damages to direct victims for purely emotional distress. (*Infra.*)

## III.

### *The Test's First Prong—a Preexisting Relationship*

It is from the *Burgess* definition of "direct victim" that we have synthesized, so to speak, the first prong of the test we recommend. ■ More particularly, it can fairly be hypothesized from the *Burgess* pronouncements that the threshold question or first prong of our recommended test is to ask if there has been a preexisting, consensual relationship between the emotionally distressed plaintiff and the allegedly offending defendant. If not, that plaintiff is not in the class of persons whom *Molien* and *Burgess* perceive as having a protected interest in being free of the negligent infliction of emotional distress. If there has been such a relationship, the policy inquiry into liability, featuring a search for the *Andalon* line, can continue.

### A.

### *Preface to Analysis of the Post-Molien Cases*

With the foregoing *Burgess*, direct-victim definition (preexisting relationship) established as the basis for the initial screening of cases for purely emotional distress, we set about examining a collection of 26 post-*Molien*, emotional-distress cases, besides *Marlene F.* and *Burgess*. This effort took the form of a search for that "line between liability and nonliability" recognized in *Andalon, supra*, 162 Cal.App.3d 600, 607. The table, attached as an appendix, groups these 26 cases in a variety of ways. There is a group, all predating *Burgess* except one, where the courts ruled against liability at the outset because plaintiffs were held not to be direct victims. There is another group where the courts, even though there was a preexisting relationship, yet denied liability for policy reasons. Finally, there is a group of direct-victim cases where recovery was allowed. In two of this latter group, there had been no preexisting relationship between the parties. In the first of these "hybrid" cases, the plaintiff was identified as a direct victim because of having also been the victim of other tortious conduct. In the second, the

court implied that plaintiff was a direct victim by invoking *Molien* where the plaintiff had also been the victim of other tortious conduct.[5]

We also decided it useful to identify specially the medical malpractice cases and the legal malpractice cases. It appears that those two groups of decisions are developing in their own directions of disposition.[6] (*Infra.*)

Otherwise we classified the cases in the catalogue as involving either *adjunct* or *nonadjunct* claims for emotional distress damages. These classifications involve whether such claims were asserted in addition to *other* claims for damages (thus, adjunct) or whether such claims stood alone (thus, nonadjunct).

Before turning to this detailed analysis, two observations are in order. First, in none of these 26 cases has there been recovery for negligent infliction of emotional distress unless *the plaintiff was first characterized as a direct victim*, even as defined in the two "hybrids" noted. Thus, except for these "hybrids," each of the recovering "direct victims" had a preexisting consensual relationship with his or her defendant. Second, there is no uniformity in the way the courts approached their decisional task in these cases. In other words, there is no common ratio decidendi shared by the 26 cases analyzed.

B.

*Analysis of the 26 Post-Molien Cases*

1.

*Nondirect Victim Cases*

Responding to the first prong of the approach we have evolved, the initial grouping contains cases in which the courts held that the plaintiffs could not recover because they were not direct victims, so ruling of course without inquiring whether a preexisting relationship existed between the parties. This

---

[5]Compare *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795], where there was also no preexisting relationship but where the possibility of recovering adjunct emotional distress damages, under limited conditions, was recognized in a case where Firestone, before the Supreme Court, did not claim it was not negligent in illegally dumping carcinogenic chemical waste which contaminated plaintiffs' underground water supply, thereby inducing a fear of contracting cancer.

[6]Compare *Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124 [24 Cal.Rptr.2d 587, 862 P.2d 148], where the Supreme Court, in a recent pharmacist malpractice case, declined to regard the parents of an infant, whose prescription instructions were erroneous, as direct victims and thereupon ruled against their emotional distress claim.

was to be expected; all but one are pre-*Burgess* cases. The 11 cases in which the panels held that the plaintiffs were not direct victims and hence not entitled to recover include: *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008 [200 Cal.Rptr. 746] (*Cooper*); *Wiggins* v. *Royale Convalescent Hospital* (1984) 158 Cal.App.3d 914 [206 Cal.Rptr. 2] (*Wiggins*); *Soto* v. *Royal Globe Ins. Co.* (1986) 184 Cal.App.3d 420 [229 Cal.Rptr. 192] (*Soto*); *Martinez* v. *County of Los Angeles* (1986) 186 Cal.App.3d 884 [231 Cal.Rptr. 96] (*Martinez*); *Kossel* v. *Superior Court* (1986) 186 Cal.App.3d 1060 [231 Cal.Rptr. 183] (*Kossel*); *Anderson* v. *Northrop Corp.* (1988) 203 Cal.App.3d 772 [250 Cal.Rptr. 189] (*Anderson*); *Holliday* v. *Jones* (1989) 215 Cal.App.3d 102 [264 Cal.Rptr. 448] (*Holliday*); *Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270] (*Golstein*); *Burger* v. *Pond* (1990) 224 Cal.App.3d 597 [273 Cal.Rptr. 709] (*Burger*); *Schwarz* v. *Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470] (*Schwarz*), and *Evan F.* v. *Hughson United Methodist Church* (1992) 8 Cal.App.4th 828 [10 Cal.Rptr.2d 748] (*Evan F.*). All of the foregoing cases except *Evan F.* predated *Burgess*; *Evan F.* was issued a month after *Burgess* and relied upon its direct-victim definition.

Of the foregoing, *Martinez*, *Kossel* and *Golstein* were medical malpractice cases. *Martinez* was a case in which a child suffered permanent neurological damage at birth; nevertheless, in a pre-*Burgess* decision, the court readily rationalized the result reached by holding that the parents *were not direct victims* in the *Molien* sense.

Likewise, in *Kossel*, where the surviving spouse sued for medical malpractice following her husband's death from Hodgkins disease, the intermediate court, in denying the plaintiff's petition for a writ after the defendant doctor's demurrer to the emotional distress count was sustained (and after an exhaustive dissection of *Molien*) held the plaintiff surviving spouse not to be a direct victim of the doctor's negligence.

In *Golstein*, where the defendant hospital had negligently administered a fatal overdose of radiation to the plaintiffs' child during a treatment for curable cancer, the defendant's demurrer to the emotional distress count was sustained and the parents' petition for a writ was denied. In rationalizing the result it reached, the court treated *Golstein* solely as a *Dillon* case in which the parents did not meet the traumatized family bystander criteria.

No useful purpose could be served to abstract here all of the so-called nondirect victim cases. However, *Schwarz* is illustrative of the struggle the courts have had with this kind of case and thus merits discussion. After a bitter divorce which included an award of joint custody of the couple's

minor son, the plaintiff's son began a program of psychotherapy in the child outpatient department of the Medical Center at the University of California at Los Angeles. Upon the treating therapist's recommendation, the plaintiff father agreed that the son live solely with his mother. From time to time the parents would engage in joint consultation with the therapist, and the plaintiff even agreed to undertake individual counseling.

After about a year of this, the mother advised the therapist that she was going to move to England and take the son with her. The therapist counseled the son that this would be the right thing for him to do and "aided, encouraged, assisted and facilitated [the son's] mother in implementing her plan to remove [the son] from the country and conceal his whereabouts from plaintiff." (*Schwarz, supra*, 226 Cal.App.3d 149, 152.)

Almost two years later the plaintiff learned that his son was in England. In the course of his unsuccessful efforts to gain custody of his son, the plaintiff learned of the therapist's involvement in the deception. His palpable shock and emotional distress which resulted were of course foreseeable.

The case was dismissed at the trial court level after the defendant's demurrer was sustained without leave to amend. On appeal, the reviewing court affirmed. Justice Spencer agonized as she worked through an exhaustive discussion of the authorities, including *Dillon, Molien, Marlene F., Thing* and *Andalon*. Her citation of *Andalon* led to discussion of *Newton v. Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890] (*Newton*), relied upon heavily by the plaintiff. After criticizing *Newton* as an unwarranted extension of *Andalon*, Justice Spencer indicated her preference for *Martinez, supra*, 186 Cal.App.3d 884. Based on this authority, the Schwarz opinion confirmed ". . . when the negligence is alleged to have occurred during the medical treatment of the child, the defendant's conduct is directed solely at the child, the intended third party beneficiary of the contract [citation], and not at the parent who enters into the contract solely as a surrogate for the minor child who otherwise could disaffirm it. [Citations.] In sum, the simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent. [Because] plaintiff alleges nothing but negligence in the psychotherapeutic treatment of his son, he has failed to state a claim based on the negligent infliction of emotional distress." (*Schwarz, supra*, 226 Cal.App.3d 149, 168, fn. omitted.) In our view, it would have been easier per *Burgess* to concede that the plaintiff qualified as a direct victim because of the preexisting relationship with the therapist, and then to reach a policy decision that the therapist's conduct was not sufficiently outrageous to justify an award

for purely emotional distress. (Cf. *Branch* v. *Homefed Bank* (1992) 6 Cal.App.4th 793, 800-801 [8 Cal.Rptr.2d 182].)

In the six pre-*Burgess* cases, not here abstracted: *Cooper*; *Wiggins*; *Soto*; *Anderson*; *Holliday*; and *Burger*, none of the plaintiffs had had a preexisting relationship with the defendants. Thus, this group of decisions correctly prophesied by implication the definition of direct victim finally announced in *Burgess*. As above noted, the last case in this group, *Evan F.*, specifically relied upon the *Burgess* definition in holding that the plaintiff Eyrene, *sister* of the molested victim, was not a direct victim and hence not entitled to recover. (*Evan F.*, *supra*, 9 Cal.App.4th 828, 840.)

### 2.

### *Direct Victim Cases*

This major classification contains four subgroups. These include two groups of adjunct cases where recovery was either allowed or denied and two groups of nonadjunct cases where recovery was either allowed or denied.

### a.

### *Adjunct Claims for Emotional Distress Denied*

This subgroup of five cases includes three legal malpractice cases: *Merenda*, *supra*, 3 Cal.App.4th 1; *Smith* v. *Superior Court* (1992) 10 Cal.App.4th 1033 [13 Cal.Rptr.2d 133] (*Smith*); *Pleasant* v. *Celli* (1993) 18 Cal.App.4th 841 [22 Cal.Rptr.2d 663] (*Pleasant*). The other two cases, not involving legal malpractice, are: *Branch* v. *Homefed Bank*, *supra*, 6 Cal.App.4th 793 (*Branch*) and *Selden* v. *Dinner* (1993) 17 Cal.App.4th 166 [21 Cal.Rptr.2d 153] (*Selden*).

In *Merenda*, the plaintiff and petitioner sought a writ of mandate from the Court of Appeal vacating an order which the trial court had issued in favor of defendant real party in interest, adjudicating plaintiff as not entitled either to damages for emotional distress or to exemplary damages in a legal malpractice case. The court declined to authorize issuance of a writ with respect to the emotional distress damages issue (although it did so with respect to the exemplary damages issue, ruling that such damages are recoverable under appropriate facts in a legal malpractice case).

Our interest is in that portion of the decision which ruled against entitlement to damages for emotional distress based on negligence. In rationalizing

its decision, the court first noted that *Molien* had "abandoned the rule requiring physical impact or physical injury as a predicate for recovery for emotional distress caused by mere negligence." (*Merenda, supra,* 3 Cal.App.4th at p. 7.) *Merenda* next observed, echoing the *Andalon* pronouncement eight years earlier, that, "[t]he fact that emotional distress damages may be awarded in some circumstances [citation] does not mean they are available in every case in which there is an independent cause of action founded upon negligence." (*Ibid.*)

*Merenda* recognized that there is a legal duty to the client to avoid negligence in the practice of law. However, the court then discussed whether such duty extends to the risk of emotional distress and reviewed the factors to be considered in assessing duty as they are collected in *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] (*Biakanja*), and enhanced in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*). Justice Puglia then proceeded to state that ". . . foreseeability of serious emotional harm to the client [is] tenuous." (*Merenda, supra,* 3 Cal.App.4th 1, 10.) After further discourse, he concluded "that recovery may not be had for emotional distress attributable to the legal malpractice alleged in this case." (*Id.* at p. 11.)

In view of the fact that the plaintiff qualified as a direct victim per *Burgess* because of the preexisting relationship of attorney and client, we were led to conclude that a *policy* decision was made in *Merenda* that the circumstances were not sufficiently egregious or outrageous as to justify an adjunct award of additional damages for the negligent infliction of emotional distress.

*Smith* and *Pleasant* are replays of *Merenda.* While *Smith* was a writ case, *Pleasant* is demonstrative indeed because it involved *reversal* of a substantial jury award for emotional distress. The plaintiff's newborn child died, apparently as a result of medical malpractice. She turned to the defendant, an attorney, to prosecute the case for her. As a result of *legal malpractice,* the statute of limitations was permitted to run on the *medical malpractice* claim. This led to the underlying litigation which included a count for negligent infliction of emotional distress. The jury awarded the plaintiff $350,000 for the wrongful death of her child, plus $5,000 for funeral expenses. It also awarded the plaintiff $500,000 damages for negligent infliction of emotional distress. (*Pleasant, supra,* 18 Cal.App.4th 841, 846.)

On appeal, the reviewing court modified the judgment by striking the $500,000 in damages for negligent infliction of emotional distress. (*Pleasant, supra,* 18 Cal.App.4th 841, 855.) After references to and varied discussions of *Quezada v. Hart* (1977) 67 Cal.App.3d 754 [136 Cal.Rptr. 815]

(which it regarded as superseded by later Supreme Court holdings), and of *Smith, Molien, Burgess, Holliday* and *Marlene F.*, the court in *Pleasant* zeroed in on *Merenda. Pleasant* stated flatly that *Merenda*'s "analysis applies with equal force here." (18 Cal.App.4th at p. 854.) *Pleasant* then quoted that analysis, " 'The moral blame attached to defendants' conduct is only that which attends ordinary negligence. There is no suggestion of bad faith or reckless indifference to the plaintiff's interest in emotional tranquility. The policy of preventing future harm is served by the sanction of compensation for the economic loss occasioned by the malpractice. The burden to the defendant of avoiding malpractice is of no moment since that burden has already been imposed. The principal consequences to the community of imposing an incremental liability for these damages are the additional costs of doing business as a lawyer and the benefits of socialization of the risk of emotional injury.' " (*Ibid.*) The court then concluded by observing, "In sum, a consideration of the factors listed in *Christensen* and *Burgess* leads us to the conclusion that emotional distress damages may not be recovered in this case as a matter of law." (*Ibid.*)

In *Branch*, a case arising from an economic loss, the plaintiff, a former employee of the defendant bank, sued the bank, alleging a number of counts, including breach of contract and wrongful termination, along with both intentional and negligent misrepresentation. (*Branch, supra*, 6 Cal.App.4th 793, 797.) The plaintiff initiated the litigation after being lured away from a lucrative position in Los Angeles on the basis of effusive representations about bonuses, medical benefits and rapid salary increases—none of which materialized. After the plaintiff attempted to persuade the defendant bank to make good on its representations, he was stripped of all responsibilities and "assigned 'busy work'; and he was placed in a cubicle, without a phone or even a trash can, and told to stay there and remain silent." (*Id.* at p. 797.)

After a variety of both pretrial and trial motions and orders, the case went to the jury on only two theories of liability: 1) negligent representation and 2) wrongful termination in violation of public policy. (*Branch, supra*, 6 Cal.App.4th 793, 797.) The jury verdict awarded the plaintiff economic damages of $45,163 and emotional distress damages of $60,000. (*Ibid.*) On appeal, the economic damage award was affirmed and the emotional distress award was reversed. (*Id.* at p. 801.)

In rationalizing its reversal of the award of damages for negligent infliction of emotional distress, the *Branch* court observed generally that it believed the settled law to be, ". . . that damages for emotional distress are ordinarily not recoverable in an action for negligent misrepresentation when the injury other than emotional distress is only economic." (*Branch, supra*, 6

Cal.App.4th 793, 798.) Otherwise, it stated, "[t]he general rule of damages permissible in negligence actions was set forth in *Quezada*[, *supra*,] 67 Cal.App.3d 754 . . . ." (*Id.* at p. 800.) The *Branch* court then went on to acknowledge (*Quezada* notwithstanding) that damages for purely emotional distress had been recovered in *Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 215 [163 Cal.Rptr. 445] (mishandling of cremated remains), and *Molien*, *supra*, 27 Cal.3d 916, 930 (negligent advice to patient that she had syphilis, resulting in severe distress to her husband). It also noted that recovery had been allowed when negligence arose in a situation involving breach of a fiduciary duty or quasi-fiduciary duties, as in a failure to pay insurance proceeds (to an insured), citing *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032] and *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470].[7] In this connection, the *Branch* court concluded, "Our employee's case fits into none of these exceptions to the general rule. Employee suffered no physical impact which caused injury. The claim arose from a rather typical negotiation for employment in a very prosaic business setting—a bank. While damage as the result of employee's reliance on Bank's negligent misrepresentations could be anticipated, nothing in the case suggests the peculiarly sensitive emotional trauma foreseeable in such cases as *Allen* v. *Jones* or *Molien*. *While blameworthy, the Bank's conduct in no sense can be described as 'extreme' or 'outrageous,' in terms of the conduct resulting in special damages in the insurance cases such as Gruenberg.*" (6 Cal.App.4th at pp. 800-801, italics added.)

The plaintiff Branch, per *Burgess*, was a direct victim because of the preexisting relationship as an employee of the defendant bank. However, despite this relationship, the *Branch* court made a policy decision that the defendant bank's conduct was not sufficiently outrageous to justify recovery. It said, "[r]ecovery for worry, distress and unhappiness as the result of damage to property, loss of a job or loss of money is not permitted when the defendant's conduct is merely negligent. As has been stated elsewhere, 'emotional distress is but "part of the human condition." ' " (*Branch*, *supra*, 6 Cal.App.4th 793, 801.)

Continuing, "[l]oss by anyone of property or money and certainly loss of expected wages will normally produce mental anguish. ' "Complete emotional tranquility is seldom attainable in this world . . ." ' . . . and especially will be found absent when one has been misled by negligent representations." (*Branch*, *supra*, 6 Cal.App.4th 793, 801.) In concluding, the *Branch*

---

[7]In *Soto*, *supra*, 184 Cal.App.3d 420, 433-434, we overruled that part of *Jarchow* v. *Transamerica Title Ins. Co.*, *supra*, 48 Cal.App.3d 917, 934-940, which purports to recognize a cause of action for negligent infliction of emotional distress.

court stated, "[r]ecovery for the inevitable distress resulting from finding oneself the victim of a negligent tortfeasor is, however, limited to economic loss unless malice, breach of a fiduciary duty, physical injury or impact, or some other unusually extreme or outrageous circumstance, can be shown." (*Ibid.*, fn. omitted.)

The foregoing language in *Branch* gave significant support to our nascent conclusion that the "something more" which a direct victim must establish in order to recover damages for purely emotional distress is conduct on the part of defendant which was "unusually extreme or outrageous." (*Branch, supra,* 6 Cal.App.4th 793, 801.)

In *Selden*, the plaintiff Rena Selden was afflicted with breast cancer. After one mastectomy, a second was recommended by her oncologist. Looking to this eventuality, Selden contacted the defendant Melvin Dinner, M.D., a plastic surgeon, nationally recognized as an expert in performing certain reconstructive surgery (abdominal island flap). Selden hoped to undergo such reconstructive surgery following the second mastectomy. After the contact noted, Selden met with Dinner in La Jolla. She advised him of the urgency of the procedure because her insurance was about to expire. The surgery was scheduled to take place in Scripps Memorial Hospital six days later.

On the appointed day, after Selden checked into the hospital, put on a hospital gown and was placed on a gurney, Dinner appeared in her room in a great state of agitation and advised her he could not perform the surgery as agreed. Dinner had been practicing in Ohio and was in the process of moving his practice to La Jolla at the time the surgery arrangements with Selden were made. Apparently, before Dinner visited Selden's room, a heated argument had ensued between Dinner and the hospital medical staff on the subject of who and what kind of surgeon would be required to "monitor" Dinner's procedure. Because he became so emotionally upset by the argument, Dinner reached a decision that he could not effectively perform the surgery contemplated and told Selden so.

The parties met later that day at Dinner's clinic in LaJolla and a rescheduling of the surgery was tentatively discussed. For our purposes here, it is enough to note that Dinner never performed the surgery on Selden. The preventive mastectomy was eventually performed by another surgeon who also accomplished the reconstructive surgery using implants.

All this apparently upset Selden sufficiently to cause her to sue Dinner. Her complaint alleged breach of contract, detrimental reliance, intentional

infliction of emotional distress, negligent infliction of emotional distress and medical nonfeasance. (*Selden, supra,* 17 Cal.App.4th 166, 171.)

In the trial court, Selden was not permitted to pursue her count for medical malpractice because she was unable to present any expert testimony to support such claim. The trial court otherwise ruled that Selden could not recover emotional distress damages on account of defendant's breach of his contract to perform professional services. Yet otherwise, the trial court granted a nonsuit as to the intentional infliction of emotional distress count.

The proposed verdict form provided for separate findings of Selden's damages for breach of contract and damages for negligent infliction of emotional distress. However, the trial court rejected the special verdict form and insisted that a general verdict form be used. Thereupon, the jury returned a general verdict for Selden, awarding her $400,000 in damages.

On appeal, the judgment on the verdict was reversed. The reviewing court, while conceding there was evidence to support some manner of award for the breach of contract, yet noted that it had "no means of determining how the jury resolved this conflict over the amount of Selden's economic losses" (*Selden, supra,* 17 Cal.App.4th 166, 176), and so, on reversal, the trial court was instructed to determine the amount of Selden's economic damages only.

With reference to the award of damages for the negligent infliction of emotional distress, the court was categorical in stating that ". . . there is no legal basis for recovery of emotional distress damages" (*Selden, supra,* 17 Cal.App.4th 166, 176) on the basis of the evidence in the record. Accordingly, the court held that the trial court had erred in denying Dinner's motion for nonsuit as to the count based on negligent infliction of emotional distress. (*Ibid.*)

The court next invoked *Burgess, supra,* 2 Cal.4th 1064, quoting therefrom, " '. . . a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached.' " (*Selden, supra,* 17 Cal.App.4th 166, 175.) After noting, as in *Burgess,* that Selden's relationship to Dinner was solely a physician-patient relationship, the court stated, "[t]he duties which were imposed on Dinner by virtue of the relationship were twofold: to fulfill his promises to Selden and to treat her within the standard of care. [Citations.] We are unaware of any other duty which arises *by virtue* of the physician-patient relationship." (*Id.* at pp. 175-176, italics in original.) This led the court to conclude, "[i]n short then, neither the contractual nor tort aspects of

Dinner's relationship with Selden support an award of emotional distress damages growing out of any negligence on Dinner's part." (*Ibid.*)

From the foregoing, it appears to us that the *Selden* court, because there was no medical malpractice proved as to Dinner, when it undertook to match its case with *Burgess*, decided there could be no emotional distress damages recovered by Selden, such as were recovered in *Burgess*, where the medical malpractice was a conceded predicate for considering emotional distress damages.

In our view, quite apart from any linkage of emotional distress to medical malpractice, by defining Selden as a "direct victim" because of the preexisting, consensual relationship with Dinner, *the possibility* was thereby presented to the court that Selden enjoyed a protected interest in being free from Dinner's negligent infliction of emotional distress. Thus, the result reached in *Selden* could be rationalized as one based on a policy decision, i.e., that Dinner's conduct did not reach a sufficient level of outrage to impinge upon that protected interest and hence did not justify an award of money damages for emotional distress, the preexisting relationship notwithstanding.

b.

*Adjunct Claims for Emotional Distress Allowed*

This subgroup of five cases includes four medical malpractice cases, plus one hybrid where the court characterized the plaintiffs as direct victims (although there was no preexisting relationship with the defendant), along with another nonmedical malpractice, regular direct victim case. Three of the four medical malpractice cases are pre-*Burgess*: *Accounts Adjustment Bureau* v. *Cooperman* (1984) 158 Cal.App.3d 844 [204 Cal.Rptr. 881] (*Cooperman*); *Andalon, supra,* 162 Cal.App.3d 600; and *Newton, supra,* 184 Cal.App.3d 386. The post-*Burgess* case is *Jacoves* v. *United Merchandising Corp.* (1992) 9 Cal.App.4th 88 [11 Cal.Rptr.2d 468] (*Jacoves*). The one nonmedical malpractice case in this group is *Long* v. *PKS, Inc.* (1993) 12 Cal.App.4th 1293 [16 Cal.Rptr.2d 103] (*Long*).

In *Cooperman*, the plaintiff collection agency sued the Coopermans to collect the unpaid bill of Luelyne B. Doscher, Ph.D. The Coopermans (cross-complainants) then responded with a cross-complaint for malpractice (misdiagnosis of their two-year-old child) against Dr. Doscher; the cross-complaint included a count *by the parents* for negligent infliction of emotional distress. The further facts showed that the two-year-old son of the cross-complainants was not nearly as seriously afflicted as Dr. Doscher had

diagnosed him to be (shades of *Molien*). Nevertheless, Dr. Doscher's demurrer was sustained without leave to amend. On appeal from the resulting judgment of dismissal, the reviewing court reversed, noting that it was error not to afford the cross-complainants an opportunity to amend. (*Cooperman, supra,* 158 Cal.App.3d 844, 849.)

After some discussion of *Molien*, the court said, "[a]lthough the Coopermans did not allege sufficient facts to constitute a cause of action, it was. error for the court below not to grant leave to amend. Although the Coopermans' complaint is poorly pled, it is possible that sufficient circumstances to constitute a cause of action could be pled." (*Cooperman, supra,* 158 Cal.App.3d 844, 848.) Looking to this possibility, the court continued, "A negligent diagnosis of a child can, as a matter of law, cause serious emotional distress to a parent. It would be pure fiction to believe that a negligent diagnosis of a two-year-old could not foreseeably cause parents serious emotional distress. A two-year-old has no one but parents to be distressed. Parents having sole responsibility for their child can be direct victims of their child's misdiagnosis." (*Id.* at pp. 848-849.)

Here, the preexisting consensual relationship between the cross-complainants and Dr. Doscher was present. However, the court, with no discussion of policy reasons whatsoever, went on to assume the liability issue, holding "as a matter of law" that a negligent diagnosis of a child can cause serious (and hence compensable) emotional distress to a parent. (*Cooperman, supra,* 158 Cal.App.3d 844, 848; cf. *Golstein, supra,* 223 Cal.App.3d 1415, 1427.) The court ruled thusly, notwithstanding, as it turned out, that the child suffered only from a mild learning disability and from an adjustment reaction of childhood. (158 Cal.App.3d at p. 846.)

As noted, there was a preexisting consensual relationship between the cross-complainants and Dr. Doscher, enabling them to qualify as direct victims and thus to be viewed as being eligible for recovery of emotional distress damages adjunct to the medical malpractice claim.

The nature of the cross-defendant psychologist's conduct, while amounting to medical malpractice, clearly did not rise to the level of outrage as, say, in *Branch*. Therefore, because recovery here was yet countenanced by the court, we are led to a supposition that *the lesser actionable level* of egregiousness of this defendant's behavior may signal a trend of decision in holding *more readily* for recovery of emotional distress damages in medical malpractice cases than in others.

In *Andalon*, the court, entertaining companion writ petitions, addressed a variation of *Burgess*, so to speak. In what amounted mainly to a medical

malpractice case, the defendant doctor allegedly failed, during prenatal care and treatment of the plaintiff mother, to diagnose the unborn child's affliction with Down's syndrome, thereby depriving the parents of their choice to abort the pregnancy. Thus, the case was one for *wrongful life*. Of particular interest here, by means of pretrial motions for summary adjudication, the defendant doctor sought to limit the measure of damages and to preclude the parents' opportunity to recover damages for negligent infliction of emotional distress. He was successful in the trial court. However, the trial court's rulings were vacated by peremptory writs. (*Andalon, supra,* 162 Cal.App.3d 600, 604.)

After a very thorough review of the earlier emotional distress cases, *Andalon* then reviewed *Molien*, rationalizing its "direct victim" label in terms of *Biakanja, supra,* 49 Cal.2d 647. *Biakanja* involved an action against a notary who had failed to prepare a will according to instructions, with the result that the plaintiff, not in privity with the defendant notary, instead of being sole beneficiary, was reduced to receiving a one-eighth intestate share. *Biakanja* had no trouble finding a duty owed to the plaintiff as a kind of third party beneficiary. However, according to *Andalon*, the *Biakanja* court reached the result it did on policy grounds. (*Andalon, supra,* 162 Cal.App.3d 600, 609.)

Continuing, *Andalon* observed: "In this case we perceive both parents to be direct victims of the malpractice alleged. Mrs. Andalon was a party to the contract with the defendant and no issue of his duty to advise her concerning mongolism is tendered at this stage of the action. Mr. Andalon's interest in the receipt of information and advice on this topic mirrors hers. His injury is not merely derivative of Mrs. Andalon's injury but flows from his role as a participant in the reproductive life of the marital couple and its lawful choices. The burdens of parental responsibility fall directly upon his shoulders. The tort duty arising from the contract, between defendant and Mrs. Andalon, runs to him, not merely because of the foreseeability of emotional harm to him, but because of the nexus between his significant interests and the 'end and aim' of the contractual relationship. He is manifestly a direct beneficiary of tort-duty imposed by virtue of the doctor-patient relationship." (*Andalon, supra,* 162 Cal.App.3d 600, 611, fn. omitted.)

Thereupon, after reliance upon the language we have already quoted, recognizing the line between liability and nonliability, the *Andalon* court came down on the side of liability, impliedly concluding that the doctor's conduct in this medical malpractice context was sufficiently outrageous to support recovery of emotional distress damages as adjunct to the regular award of medical malpractice damages.

In *Newton*, the opinion begins with the recitation that ". . . we shall consider whether the parents of a child injured during childbirth stated a cause of action on their own behalf against a hospital and its doctors for negligent infliction of emotional distress. We hold that they did." (*Newton*, *supra*, 184 Cal.App.3d 386, 387.) The *Newton* court struggled in trying to rationalize the "direct victim" category. Finally, recognizing the case before it as *Andalon* revisited, and noting the preexisting doctor-patient, consensual relationship, the court observed, "but here Kaiser entered into a contract with the mother to provide care for herself and child during the birth process. A duty of care may arise from contract even though there would otherwise be none. [Citation.] The mother had a contract with Kaiser by which it undertook, for consideration, to provide care and treatment for the delivery of a healthy fetus. Kaiser's contract was the source of its duty and a determination of foreseeability is unnecessary to establish a duty of care. Under *Andalon*, that duty extended to the father as well. . . . [Because] Kaiser's duties arose contractually, the trial court erred in holding that the third cause of action failed to state a valid cause of action." (*Id.* at pp. 392-393.)

Once the direct-victim classification had been made, the *Newton* court appeared to accept that that was all that was necessary to state a cause of action. *Newton* suggested the trend in medical malpractice cases, particularly those involving childbirth, where the allowance of adjunct damages for emotional distress may be approaching pro forma status. In other words, the *Newton* court did not acknowledge, as *Andalon* had, that there is a line somewhere at which liability ends and nonliability begins.

*Jacoves*, the last medical malpractice case in this group which allowed adjunct damages for negligent infliction of emotional distress, is a post-*Burgess* decision. In *Jacoves*, the parents of a 20-year-old psychiatric patient sued a hospital and a sporting goods store after their son, who had been released from the hospital, purchased a rifle and committed suicide. The parents' complaint alleged that their son had been prematurely (and therefore negligently) released by the defendant hospital and that the defendant sporting goods store had been negligent in selling the rifle to him. The parents were aggrieved by the alleged negligence of both defendants in that such negligence had caused them emotional distress *in addition to damages* in their statutory action for wrongful death of their son.

The emotional distress damage claims were resolved in the trial court by summary judgment in favor of the defendant hospital and by a judgment on the pleadings in favor of the defendant sporting goods store. (*Jacoves, supra*, 9 Cal.App.4th 88, 96.) On appeal, the reviewing court affirmed as to the defendant sporting goods store but reversed as to the defendant hospital,

holding that a triable issue of fact remained on the adjunct damages claim as to whether the physician employed by the hospital had been negligent. (*Id.* at pp. 110, 119.)

In rationalizing the result it reached, the *Jacoves* court concluded that a duty of care not to inflict emotional distress upon the parents rested upon the hospital. This holding reflected recognition of the key allegations of the complaint to the effect that: 1) their son's discharge from the hospital was conditioned upon the parents' willingness to care for him at home and that they were unwilling to do so without some assurance that their son would agree not to harm himself; 2) the parents thus became direct intended beneficiaries of their son's care; or 3) they were intended by the defendant hospital to be included as instrumentalities in their son's treatment. (*Jacoves, supra,* 9 Cal.App.4th 88, 107.)

On the peculiar facts in *Jacoves*, the court recognized the right of the parents to adjunct damages for purely emotional distress by reason of the preexisting consensual relationship of the parents with the staff physician employed by the hospital, which, under the *Burgess* definition, operated to make them *direct victims* of the physician's negligence. Implicit in the reversal, was the court's conclusion, if possible negligence were found, that policy would support an award of adjunct damages for negligent infliction of emotional distress.

That leads us to discussion of *Long*, the single case in this subgroup which, in a nonmedical malpractice context, recognized the right to adjunct claims for damages arising by reason of the negligent infliction of emotional distress. The facts in *Long* are compelling. A husband and wife joined in an action against a tow-truck owner and the driver of the truck, who caused it to collide with the wife's vehicle from behind. As a result of the collision, the wife was seriously injured and her 27-year-old foster daughter was killed. At the trial, negligence was conceded; thus, the only issues to be resolved were those involving damages. In a special verdict, the jury awarded the wife $41,080 for physical pain and suffering, plus an additional $120,000 for her emotional distress experienced as a result of witnessing the gruesome death of her foster daughter.

On appeal, the defendants assigned as error the trial court's jury instruction that the wife was entitled to damages for emotional distress arising as a result of witnessing her foster daughter's death. The reviewing court affirmed the judgment for the plaintiff wife in its entirety. In rationalizing its decision, the *Long* court characterized the wife as the "direct victim" of the defendants' negligence, equating her position to that of the mother in

*Burgess* (*Long, supra,* 12 Cal.App.4th 1293, 1298-1299), without any reference to and notwithstanding the absence of a preexisting relationship between the wife and the defendants.

Unfortunately, from the standpoint of aiding the development of our suggested test for use in deciding emotional distress cases, the defendants argued their case on a *Dillon* theory, i.e., the plaintiff could not be a traumatized family bystander because the decedent was not a blood member of the family. To this, the *Long* court said, "[t]he policies behind limiting recovery for emotional distress suffered by a bystander simply do not apply to a plaintiff who is a direct victim *and suffers injury* as a result of the defendant's negligence. With a direct victim such as [the wife], there is little fear that her claim is fraudulent or that defendants will be saddled with liability out of proportion to the degree of fault. The circumstances of the case 'guarantee' the 'genuineness' of [the wife's] emotional distress. [Citation.]" (*Long, supra,* 12 Cal.4th 1293, 1298, italics added.)

The *Long* decision suggests, when a person is *simultaneously the victim of other tortious conduct*, that such person thereby qualifies as a "direct victim" for purposes of recovering additional damages for emotional distress. Such suggestion arises from the *Long* court's citation to and discussion of three out-of-state cases, all of which allowed the plaintiffs who had suffered *physical injuries* also to recover damages for emotional distress arising by reason of their having witnessed trauma to another.

Finally, *Long*, in concluding its rationalization, relied upon foreseeability and not public policy, stating, "[a]s one who suffered physical injury as a result of defendants' negligence, [the wife] was entitled to recover all reasonably foreseeable damages. Such damages included any emotional distress suffered as a result of witnessing the fatal injuries to [her foster daughter]." (*Long, supra,* 12 Cal.App.4th 1293, 1301.)

What this case appears to add to the mix is an alternative basis for defining a person as a "direct victim" for purposes of enabling him or her to recover damages for negligent infliction of emotional distress. Such alternative basis obtains when a plaintiff has simultaneously suffered physical trauma. However, even after the direct victim characterization, under the alternative definition, has attached, we suggest that it remains to be decided whether the provocation of the emotional distress (here, the defendant's causing a rear-end collision) constitutes, as a public policy matter, sufficiently outrageous behavior to justify the award of adjunct money damages. In *Long*, the point was assumed; there was no discussion of the policy issue.

c.

*Nonadjunct Claim for Emotional Distress Denied*

In this subgroup, there is only one case, *Allen* v. *Toten* (1985) 172 Cal.App.3d 1079 [218 Cal.Rptr. 725] (*Allen*).

In *Allen*, a wife sued Shasta County and certain of its peace officers seeking damages for negligent infliction of emotional distress. Such distress allegedly occurred when the peace-officer defendants requested the plaintiff to come to the scene where her armed husband was engaged in a standoff with the officers. Their hope was that her presence could effect his surrender. However, by reason of being at the scene, the plaintiff later saw her husband shot and wounded by defendants. A trial court jury awarded the plaintiff $50,000 in emotional distress damages. On appeal, the reviewing court reversed the judgment.

The defendants' position on appeal was that the plaintiff had improperly pursued her case on a *Dillon* theory or, alternatively, that there had been no negligence on their part, as a matter of law. The plaintiff conceded the former position but contended instead, under *Molien*, that she was a direct victim of the negligent decision to request her presence at the scene of the standoff. The reviewing court ruled against her. (*Allen, supra,* 172 Cal.App.3d 1079, 1091.)

In rationalizing the result it reached, the *Allen* court relied wholly on the seven so-called *policy* factors announced in *Rowland, supra,* 69 Cal.2d 108, 112-113, as determinative of whether one owes a duty of care to another. In doing so, the *Allen* court overlooked that *Rowland* was a *personal injury* case. (*Rowland,* at p. 110.) After discussing in detail the facts of the case in the context of the seven factors, the *Allen* court said, "[i]n sum, what in the absence of these policy considerations would otherwise be a tort[,] is not one because the utility of the conduct involved (saving lives) outweighs the gravity and likelihood of the harm threatened (emotional distress)." (*Allen, supra,* 172 Cal.App.3d 1079, 1090-1091, citing *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 47 [123 Cal.Rptr. 468, 539 P.2d 36]; Prosser, Law of Torts (4th ed. 1971) p. 149.)

At the conclusion of the quoted language, *Allen* listed in footnote 9, cases in which "[c]ourts have frequently declined, on either explicit or implicit public policy grounds, to recognize tort liability because of the overweighing burden imposed upon defendants and the adverse social consequences." (*Allen, supra,* 172 Cal.App.3d 1079, 1091, fn. 9.)

In our view, the court clearly perceived its task as requiring a policy decision when it stated, "[w]e therefore hold there is no tort liability for negligent infliction of emotional distress in bringing a family member to the scene of a threatened suicide because peace officers, as a matter of public policy, have no duty to prevent that person from witnessing what is obvious, potential and inherent in all such crises." (*Allen, supra,* 172 Cal.App.3d 1079, 1091, fn. omitted.)

In *Allen,* there was a preexisting relationship, although brief, in which the wife accepted the peace officers' invitation to join them at the scene of her husband's standoff. After defining the parties' preexisting relationship, the *Allen* court proceeded to the next step, i.e., assessing the nature of the defendants' conduct, and concluded without difficulty that such conduct was not sufficiently outrageous to justify an award of money damages for the negligent infliction of emotional distress. We note that this was a nonadjunct claim and the language of the decision suggests that the level of outrage in nonadjunct cases may need to be more egregious than in adjunct claim cases in order to support recovery.

d.

*Nonadjunct Claims for Emotional Distress Damages Allowed*

This final subgroup includes four cases: *Slaughter* v. *Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236 [209 Cal.Rptr. 189] (*Slaughter*); *Bock* v. *County of Los Angeles* (1983) 150 Cal.App.3d 65 [197 Cal.Rptr. 470] (*Bock*); *Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051 [232 Cal.Rptr. 528, 728 P.2d 1163] (*Pool*), and *Phyllis P.* v. *Superior Court* (1986) 183 Cal.App.3d 1193 [228 Cal.Rptr. 776] (*Phyllis P.*).

We have listed *Slaughter* first because it is the other hybrid case where, like *Long,* the court implicitly defined the plaintiff as a direct victim although there had been no preexisting relationship between the parties.

In *Slaughter,* the antecedent action showed that a landlord had retained the defendant process server to serve copies of a summons and a complaint on the plaintiff tenant. Although the plaintiff was never properly served, the process server executed a false affidavit of service. This wrongdoing led to a default judgment of eviction against the tenant. After the judgment was set aside, the tenant as plaintiff sued everyone, including the landlord, alleging a laundry list of grievances. Summary judgment for all defendants was

entered on all counts. On appeal, the judgment was affirmed except as to that for negligent infliction of emotional distress by the defendant process server, the judgment as to that count was reversed. (*Slaughter, supra,* 162 Cal.App.3d 1236, 1251.)

In rationalizing its holding, the *Slaughter* court noted, in traditional language, that what was alleged here was a variation of the four elements of negligence: duty, breach of duty, causation and damages. (*Slaughter, supra* 162 Cal.App.3d 1236, 1249.) It then noted further that duty is a question of law which depends upon the foreseeability of the risk and upon a weighing of policy considerations. (*Ibid.*) *Molien* was invoked for the proposition that physical injury was no longer required as a prerequisite for recovery for emotional distress. (*Id.* at p. 1250.)

In dealing with the issue of duty, *Slaughter* discussed only foreseeability. The decision turned on the court's conclusion that an issue of fact remained as to whether the defendant had breached the duty the court ruled to be present as a result of foreseeability. (*Slaughter, supra,* 162 Cal.App.3d 1236, 1250.)

In our view, the *Slaughter* decision is something of an enigma; despite its reference to policy considerations, it did not discuss any, noting that the "evidence is arguably scant, . . ." as to the plaintiff's emotional distress. (*Slaughter, supra,* 162 Cal.App.3d 1236, 1250.) It then said, "[w]e conclude that appellant has raised triable issues of material fact as to breach, causation, and damages as to his cause of action on the theory of negligent infliction of emotional distress." (*Id.* at p. 1251.) By invoking *Molien, Slaughter* implicitly perceived the plaintiff as a "direct victim" of the defendant's willful wrongdoing in executing the false affidavit of service, thereby creating the occasion to evaluate whether the plaintiff's foreseeable emotional distress was compensable. Thus, this case parallels the result in *Long,* where reliance was placed on the alternative definition of "direct victim" as one who had been the victim of other tortious conduct.

The plaintiffs in the other three cases in this group meet the *Burgess* criteria necessary to qualify as direct victims, leaving open the further inquiry into whether the defendants'conduct was sufficiently outrageous to justify recovery of damages for the negligent infliction of emotional distress.

In *Bock,* the plaintiff widow undertook to plead an action for purely emotional distress, allegedly caused by the county coroner's negligent failure to identify the decedent's body and to notify her. The defendant county's

demurrer was sustained without leave to amend. In reversing the judgment of dismissal, to afford the plaintiff the opportunity to amend, the reviewing court took note of *Molien*. Then, after concluding that no *statutory* duty to the plaintiff had been breached, the *Bock* court opined that the plaintiff might be able to state a cause of action based on the voluntary assumption of a duty by the coroner. (*Bock, supra,* 150 Cal.App.3d 65, 72-73.) It then concluded, ". . . it appears [the plaintiff] may be able to spell out a cause of action for breach of duty arising out of a special relationship." (*Id.* at p. 73.)

Such relationship appears to be one, which, in the view of the *Bock* court, the defendant county itself had voluntarily created. From the allegations of the complaint, it can be inferred that the county undertook to assist the plaintiff. If it did so, it was obligated to act in a careful and reasonably diligent manner in carrying out the duties it had assumed. (*Bock, supra,* 150 Cal.App.3d 65, 72.) Implicit here is the holding that by its undertaking, the county created the possibility that the plaintiff would be a "direct victim" of any later negligence. In other words, it was because of the *Bock* court's suggestion that the plaintiff might be able to amend to plead a "special relationship" between herself and the coroner that we elected to classify this case as falling within the *Burgess* ambit.

In any event, this case was reported when only at the pleading stage, and should it have ever gone to trial, the issue to be resolved would have been whether the conduct of the coroner was sufficiently outrageous to support an award of damages for the negligent infliction of emotional distress.

In *Pool*, the plaintiff, a shopper in a Safeway Store in Oakland, had earlier cashed his paycheck and received fifteen $100 bills. When he attempted to pay for his groceries with one of these bills, the checker, who had been instructed to watch for counterfeit $100 bills, became suspicious. After about 10 minutes' delay, the police were summoned and, despite his protests, Pool was rudely and roughly apprehended, frisked in public view and hustled off to the police station. He was then booked, fingerprinted and strip-searched. Soon thereafter, the police, upon checking with the Department of the Treasury, determined that the $100 bill tendered by Pool was not counterfeit. Pool was nevertheless held overnight on charges of interfering with a police investigation. (*Pool, supra,* 42 Cal.3d 1051, 1056-1058.)

The litigation against Safeway and the City of Oakland which followed featured only a single cause of action against Safeway. That count, which went to the jury, was for negligent infliction of emotional distress. Although Pool had been brutally manhandled, he had suffered no physical injury. (42

Cal.3d at p. 1057.) The jury nevertheless returned a verdict against Safeway for $45,500. (*Pool*, *supra*, 42 Cal.3d 1051, 1059.)

The Supreme Court affirmed the judgment on the verdict, noting, although Safeway had conceded the theory of liability for purely emotional distress damages, that it (Safeway) argued it had not breached the duty of care owed Pool. The decision is replete with the standard language of duty based on foreseeability. (*Pool*, *supra*, 42 Cal.3d 1051, 1062-1064.) However, because Safeway did not challenge Pool's theory of liability, the case is only marginally helpful in this analysis of cases. Yet, it is on the books and represents an instance of recovering money damages for negligent infliction of emotional distress under highly egregious circumstances *despite the absence of economic loss and physical injury.*

Reflecting the *Burgess* definition, Pool was obviously a direct victim, i.e., because Pool had been a Safeway shopper before the tortious behavior occurred, he had a *preexisting consensual relationship* with the store. In addition, it is readily arguable, if Safeway had not conceded the traditional theory of liability, that the same result would have been reached; i.e., such outcome would have reflected the outrageous nature of Safeway's behavior.

In *Phyllis P.*, a mother sued a school district, alleging both intentional and negligent infliction of emotional distress arising because her daughter had been raped at school. The complaint further alleged that a series of sexual molestations of the daughter while at school had occurred before the rape and that the school authorities had elected not to notify the mother. Instead, it was alleged the school district undertook to remedy the problem itself. (*Phyllis P.*, *supra*, 183 Cal.App.3d 1193, 1195.)

The school district's demurrer to the emotional distress counts was sustained. However, upon the mother's petition, the Court of Appeal issued a peremptory writ vacating the order which had sustained the demurrer without leave to amend, and directing that the mother be afforded a chance to amend to allege the existence *of a special relationship with the defendants.* (*Phyllis P.*, *supra*, 183 Cal.App.3d 1193, 1197.)

*Phyllis P.* invoked *Molien* as holding, "that a defendant was liable for emotional distress injuries caused where, under all the circumstances of the case, the ordinary prudent person should reasonably have foreseen such injury." (*Phyllis P.*, *supra*, 183 Cal.App.3d 1193, 1196-1197.) The case is unusual in that there is no mention of the mother's being a direct victim and

there is no recognition whatsoever that the mother's claim was not based on physical injury or monetary loss. However, the decision does discount the application of Dillon and finally implies the "direct victim" rationale by noting that "petitioner's second amended complaint is defective in that it fails to allege the existence of a *special relationship*, . . ." (*Id.* at p. 1197, italics added.) It then indicated the mother "should be permitted to cure the defect by filing a third amended complaint" (*ibid.*), presumably to allege such a relationship with the school.

Like *Bock*, this was a case encountered in the pleading stage. However, we saw no difficulty in casting the plaintiff as a direct victim, per *Burgess*, because of her preexisting relationship with the school district. Should the plaintiff's complaint be amended to allege such a relationship, the issue to be resolved at trial would be whether the conduct of the school district in not notifying the plaintiff of the risk to her daughter represented that level of outrageous conduct sufficient to support an award of damages for negligent infliction of emotional distress.

## IV.

### *Foreseeability Is Useless in Fixing Duty*

Recapping the summary above, in the post-*Molien*, 26-case catalogue, there are 15 direct victim cases; of these, 9 allowed recovery and 6 did not. In each of these 15 cases, the several panels were striving to find that line between liability and nonliability, noted by Justice Blease in *Andalon*. In this exercise, many of the panels were struggling, albeit awkwardly, with the traditional concepts of duty or breach thereof from the plaintiff's standpoint, i.e., based on foreseeability. Variously, in the course of this opinion, we have emphasized that "duty" is a shorthand designation of a conclusion that a plaintiff has a protected interest to which the court must respond should such interest be transgressed by a defendant. We have also emphasized the repeated Supreme Court pronouncements that foreseeability is useless in establishing duty in purely emotional distress cases.

The obvious predicate for these pronouncements is that *emotional distress is always foreseeable*. Thus, if the risk is foreseeable in every instance, some other criterion for establishing duty must be relied upon. Accordingly, we suggest that the way to decide these cases is not to focus on the plaintiff's always foreseeable distress but instead to focus on the nature of the defendant's negligent conduct.

## V.

### *The Test's Second Prong—The Defendant's Conduct*

In the opinion up to this point we have invoked certain of the authorities in their characterization of their defendants' behavior as being "outrageous." Such references have been made to provide a predicate for pointing out that there is a body of cases in a related field where the level of outrage to which a defendant's conduct has risen provides the measure of whether duty has been breached when fixing liability.

This leads us to hark back to *Marlene F.* Justice Arguelles, author of the majority opinion, also wrote a separate concurring opinion in which he expressed the view that the professional misconduct of the defendant psychotherapist could well be characterized as the intentional infliction of emotional distress. In this regard, he said, ". . . I believe that what we have before us is a case of outrageous conduct, atrocious and offensive acts committed within a relationship of trust, that might permit the imposition of liability for the intentional infliction of emotional distress, in addition to the other theories available." (*Marlene F., supra*, 48 Cal.3d 583, 592, fn. omitted.)

In discussing this theory, Justice Arguelles traced the evolution of such a cause of action, beginning with *State Rubbish etc. Assn. v. Siliznoff* (1952) 38 Cal.2d 330 [240 P.2d 282], through *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216], and *Cervantes v. J.C. Penney Co.* (1979) 24 Cal.3d 579 [156 Cal.Rptr. 198, 595 P.2d 975], to which we would add *Agarwal v. Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58]. Invoking *Cervantes*, Justice Arguelles listed the elements of such a cause of action as, " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " (*Marlene F., supra*, 48 Cal.3d 583, 593.)

The point to be made from this related group of cases is that breach of duty is predicated not on the foreseeability of emotional distress to the plaintiff but on the level of outrage to which the defendant's conduct has risen. In this regard, as observed in *Cervantes*, "[c]onduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a

civilized community." (*Cervantes* v. *J. C. Penney Co., supra*, 24 Cal.3d 579, 593.) In applying this standard, we cannot quarrel with the result reached in *Marlene F.* In the case here, the cue to be taken from the foregoing is obvious. (*Infra.*)

Pending our final synthesis (*infra*), the additional point to be made here is that for decades the courts have had no difficulty deciding intentional infliction of emotional distress cases. That is, while it may·be difficult to describe all the possible manifestations of actionable, outrageous conduct, one has no trouble recognizing such conduct when he or she sees it.

Such conduct was present in the mortuary and crematory cases, which have been omitted from the 26-case catalogue because liability was never an issue in those cases. Starting with *Allen* v. *Jones, supra*, 104 Cal.App.3d 207, in which Justice Gardner observed, in a concurring opinion, "In no other area are the vagaries of our law more apparent than in the distinction between mental and emotional distress accompanied by physical manifesta- tion and such discomfort unaccompanied by physical manifestation" (*id.* at p. 216), a body of authority has developed which recognizes, without noteworthy rationalization, the availability of damages for purely emotional distress in this kind of case. In *Allen*, a mortician negligently lost the ashes of the decedent after cremation. A surviving family member then sued the mortician, among other things, for negligent infliction of emotional distress. A demurrer to the complaint was sustained, and a later judgment of dismissal entered. On appeal, we reversed the judgment and directed that the demurrer be overruled. (*Id.* at p. 216.) Significantly, a preexisting, consensual rela- tionship was present. Another case with similar facts and a similar outcome is *Quesada* v. *Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596 [261 Cal.Rptr. 769].

In this area of litigation, involving disposition of human remains, the last word from the California Supreme Court at this writing is *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 894 [2 Cal.Rptr.2d 79, 820 P.2d 181], echoed by *Saari* v. *Jongordon Corp.* (1992) 5 Cal.App.4th 797, 803 [7 Cal.Rptr.2d 82].

These cases were not included in the catalogue because, for the most part, they arrived at holdings of liability based upon a breach of duty which was defined by foreseeability. However, we suspect that something more was involved. In all these cases, it is easy to find foreseeability because of the extremely sensitive nature of the subject matter which focuses finally and more intently on the conduct of the defendants. The clue to our suspicion

that something more was involved lies in *Christensen* v. *Superior Court, supra,* 54 Cal.3d 868, where the Supreme Court said, "[h]ere there is no question but that the conduct of the crematory defendants [in dealing with the remains] was *outrageous and reprehensible." (Id.* at p. 869, italics added.) Thus, in addition to the intentional infliction cases, the results in the mortuary and crematory cases can be rationalized in terms of outrageous conduct by the defendants.

Returning to development of the second prong of our test, we note that the post-*Molien* effort to deal with the emotional distress cases, in the words of Justice Puglia, has demonstrated that "[n]owhere is the application of duty principles more heterodox than in the assemblage of cases pertaining to recovery for emotional distress." (*Merenda, supra,* 3 Cal.App.4th 1, 8.) To emphasize this point, we repeat our earlier quotation from *Merenda* that, "The effort to force disparate cases with a loose family resemblance into a tight, coherent, conceptual scheme has bedeviled this area of decisional law." (*Ibid.*)

Precisely! A different kind of effort is called for. Thus, the purpose of our collecting and analyzing this catalogue of 26 post-*Molien* cases has been to determine whether some "coherent, conceptional scheme" for deciding them would emerge from these decisions. In our view, it has.

In sum, for so long as the courts are going to have to deal with that vestige of *Molien* which the Supreme Court in *Burgess* confirmed as yet viable, namely that purely emotional distress inflicted upon so-called direct victims is actionable, then the need for an approach to the decisional task, *workable in every such case,* becomes imperative. We have already identified the first prong of such approach. It is to determine whether the aggrieved plaintiff is a direct victim.

Once the choice was made, announced in *Molien* and confirmed in *Burgess,* to allow direct victims to pursue such actions, that choice yielded its corollary, recognized subsequent to *Molien, that not all direct victims can recover.* (*Merenda, supra,* 3 Cal.App.4th 1, 7; *Andalon, supra,* 162 Cal.App.3d 600, 607.) In other words, for the first policy choice to be rational compels a second, identifying the manner or basis for deciding which direct victims shall be entitled to recover and which shall not. As already noted, because the plaintiff's emotional distress is always foreseeable, determination of breach necessarily must shift to an evaluation of the defendant's conduct. ■ Thus, the second prong of the test requires an inquiry into the nature of the defendant's conduct, an *inquiry whose purpose*

*is to measure the outrageousness of such conduct in order to determine whether it has risen to that level where, as a policy matter, liability shall attach. (Andalon, supra, 162 Cal.App.3d 600, 607.)*

 Putting the two prongs together, i.e., by combining the *Burgess* holdings with our analysis of the post-*Molien* cases, which suggest shifting the focus to the defendant's conduct, we have synthesized, in terms of a "Black Letter" proposition, that a person in an existing, consensual relationship with another has a legally protected interest in being free of emotional distress unintentionally caused by the outrageous conduct of that other. The result reached in *Allen, supra,* 172 Cal.App.3d 1079, reflects the application of the stated proposition. (*Id.* at p. 1091.) There, the plaintiff wife was a direct victim by reason of having been invited to the standoff scene by the peace officers. However, in measuring the conduct of those defendants, it could be determined that such conduct was not sufficiently outrageous as to amount to an invasion of the plaintiff's interest in being free from emotional distress caused by unintentional conduct. In other words, we suggest that this was the underlying reason why the $50,000 judgment on the verdict awarded the plaintiff was reversed.

There is a further housekeeping feature to be dealt with. Just as negligence (breach of duty) in personal injury cases is most times an issue of fact, so too would be "actionable outrage" (breach of duty owed to direct victims) under our recommendation. However, in all manner of cases where the extrinsic facts are not in dispute, courts not infrequently (in affirming a judgment based on granting a motion for nonsuit) rule "as a matter of law" that the defendant was not negligent, i.e., that he or she did not breach the duty of care owed the plaintiff. We envision precisely the same manner of dealing with the cases should our recommended approach be used. There will be cases where, as here (*infra*), it can be ruled as a matter of law that the "level of outrage" has not risen to that point where it is even arguable that the *Andalon* liability line has been crossed. However, absent this circumstance, the issue of outrage would be presented to the jury with appropriate instructions not unlike those relied upon in "intentional infliction" cases. On the other end of the spectrum, there will be cases where the conduct is so outrageous as to justify a directed verdict.

In any event, just as in intentional infliction cases, we are confident that the courts will have no difficulty in deciding on a case-by-case basis which conduct is and which is not sufficiently outrageous to support or preclude recovery.

## VI.

### *Defendant's Motion for Summary Judgment*
### *Was Properly Granted*

■ When the two-pronged approach above described is applied to the undisputed facts here under review, the threshold question must of course be answered in plaintiffs' favor. There was a preexisting, consensual relationship between them and defendant. However, the second question is not even a close one. To review the bidding, so to speak, this record shows that the case here does not involve an occasion where the emotional distress damages claim is for adjunct damages in a medical malpractice case. There was no medical malpractice. Thus, what the record discloses is a claim for purely emotional distress damages, *standing alone*, based upon a notion that the *manner in which the newborn child was presented to plaintiffs* was "negligent and careless."

We note again plaintiff mother's deposition testimony in which she confirmed that she expected the baby's face to be bandaged and that she "would have wanted the doctor[] to repair whatever cut there was to the face, . . ." She also affirmed that she had "no criticism [of] the way in which [defendant]conducted himself after the delivery, . . ." We also note again plaintiffs' own articulation in their brief of the theory under which they seek an award of money damages, one based on "the manner in which their lacerated baby was presented to them shortly after her birth. The claim is not a statement that the parents were harmed as the result of learning about the surgery itself. Rather they seek redress for a [perceived] direct violation of rights by the negligent conduct of defendants [*sic*] in presenting the bandaged baby, . . ." To leave no doubt about the theory of their emotional distress claim, plaintiffs' brief recites further that, "[t]he second cause of action does not focus on the surgery itself but upon the separate act of the manner in which the injured child was presented to the parents after her birth."

Compared to the facts in *Allen, Branch* and *Selden* (*ante*), where claims for negligent infliction of emotional distress in nonmedical malpractice cases were denied, plaintiffs' claim in the case before us borders on the frivolous. By their own argument to us, their claim consists simply that they were distressed by the *manner in which the child was presented*. Moreover, their brief does not even undertake to explain how or why such *presentation* provided a credible occasion for experiencing emotional distress.

All would agree that any parents would be upset by reason of their baby's cheek being cut during the caesarean section. However, *that is not the basis*

*for plaintiffs' claim.* We note again that defendant was exonerated on count one, i.e., his nicking the child's cheek with a scalpel was determined by the court not to have been negligent and, thus, that it did not constitute medical malpractice.

The question then is whether defendant doctor's behavior in "presenting" baby Brittany to plaintiffs, 30 minutes after her birth, arose to a sufficient level of outrage as to support an award of money damages for negligent infliction of emotional distress. Because the plaintiffs in *Allen*, *Branch* and *Selden* (*supra*) were held not to be so entitled, we hold here, as a matter of law, that plaintiffs are not entitled to recover.

Based upon the foregoing analysis, we further hold that the trial court properly granted defendant's motion for summary adjudication of count two of plaintiffs' complaint.

## DISPOSITION

The judgment of January 30, 1992, is affirmed.

Dabney, Acting P. J., and McKinster, J., concurred.