[No. G033454. Fourth Dist., Div. Three. Aug. 12, 2004.]

CARMELITA CRUZ, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ADVANCED OBGYN MEDICAL GROUP et al., Real Parties in Interest.

COUNSEL

Law Offices of Michels & Watkins, Steven B. Stevens and Narbeh Bagdasarian for Petitioner.

No appearance for Respondent.

Carroll, Kelly, Trotter, Franzen & McKenna, Gregory M. Hulbert, David P. Pruett and Lori A. Conway for Real Parties in Interest.

OPINION

**RYLAARSDAM, J.**—This is an action for medical malpractice allegedly resulting in birth injuries. There are bona fide issues whether the genetic condition of the minor and his mother, his guardian ad litem, caused or contributed to the injuries. Under these circumstances, the trial court did not abuse its discretion in ordering blood tests for the mother. We therefore deny the petition for a writ of mandate that sought an order directing the trial court to vacate its order that she provide blood for genetic testing.

### FACTS

Randy Cruz (plaintiff), born in 1991, sued real parties in interest Advance OBGYN Medical Group and Ayoub Khaghani (collectively OBGYN) and others alleging medical negligence resulting in birth injuries. Plaintiff's

guardian ad litem, his mother Carmelita Cruz, is the petitioner here in her own capacity. The complaint alleges OBGYN cared for mother in connection with her pregnancy and plaintiff's delivery and postnatal care, did so negligently, and caused plaintiff serious injuries, including brain damage. OBGYN moved for an order to compel blood testing of plaintiff and mother. A declaration filed with the motion stated the test would be made under the direction of John Graham, M.D., OBGYN's "medical genetics consultant," identified the specific tests requested, and noted that, if the motion were granted, these tests would require 20 milliliters of blood be drawn from mother.

Graham's declaration, also filed with the motion, stated he was board certified in the field of medical genetics, had reviewed both plaintiff's and mother's medical records, and that, based on this, "plaintiff's brain injury may have been caused, or substantially contributed to, by genetic alternations in blood clotting factors in either the plaintiff or his mother . . . ." The declaration contained further details concerning the patients' histories relating to the pregnancy and delivery and concluded with the opinion that the proposed procedures would involve little discomfort. In a supplemental declaration, Graham provided further scientific facts and references to the medical literature in support of his hypothesis as to the cause of plaintiff's injuries.

In opposition to the motion, plaintiff and mother argued that Code of Civil Procedure section 2032 (all further statutory references are to this code) does not authorize blood tests except to determine a child's blood group and does not permit painful, protracted, or intrusive medical examinations. Mother also argued she was not a party to the action and there was no authority permitting medical tests of a nonparty. Finally plaintiff contended that real parties had waived their right to seek the order for blood tests by refusing to make their expert available for a deposition.

The opposition contained the declaration of William R. Wilcox, M.D., Ph.D., who stated he was board certified both in pediatrics and in medical genetics. Wilcox identified a number of risks associated with the drawing of blood, including infection, bleeding and bruising, arterial injury, thrombosis, needle breaking, and allergic reactions to any anesthetic that might be needed. Wilcox noted special risks for plaintiff due to his condition, but because the order for testing plaintiff is no longer a subject for this decision, we need not detail that evidence. Finally, Wilcox declared there was no rationale for the requested tests; they were "not part of the standard of practice for evaluation of someone like [plaintiff]."

In a supplemental declaration, Wilcox stated that the standard of care for managing a pregnancy of one who had mother's condition would not require

genetic testing because "the treatment for [mother's] condition is the same, regardless of the underlying cause, genetic or not." He further stated that plaintiff's record did not demonstrate the "thrombotic events" that were part of Graham's hypothesis and that "the supposed genetic testing that [OBGYN] is requesting . . . does not address what this child suffered—a bleed in his brain."

After hearing oral argument, the court granted the motion. Both plaintiff and mother petitioned this court for a writ of mandate ordering the trial court to vacate its order granting the motion and enter a new order denying the motion. We denied the petition summarily. Only mother then petitioned our Supreme Court for review. The court granted mother's petition and transferred the matter to us with directions to vacate our order denying her petition and to issue an alternative writ. Complying with the order of that court, we issued an alternative writ, provided the parties with a briefing schedule, received and considered the briefs and exhibits, heard oral argument, and now again deny mother's petition.

## DISCUSSION

Mother essentially repeats the arguments made in the trial court: (1) A nonparty cannot be compelled to undergo a medical examination; (2) section 2032 prohibits testing that is "painful, protracted, or intrusive"; (3) section 2032 only permits blood testing to determine a child's blood group; (4) the trial court abused its discretion by granting the motion in view of OBGYN's failure to produce their expert for a deposition; and (5) defendants failed to support their motion with admissible evidence. We will address each of these arguments in the order presented by mother.

*Testing of a Nonparty Is Not Absolutely Prohibited and Is Appropriate Here*

■ In an action where the physical condition of a party "or other person" is in controversy, section 2032, subdivision (a) authorizes the physical examination of "(1) a party to the action, (2) an agent of any party, or (3) a natural person in the custody or under the legal control of a party . . . ." Mother qualifies as an "other person" whose physical condition is in controversy. But does she qualify as a member of one of the classes whose examination may be required? The three statutory categories of persons who may be examined are exclusive because, after the adoption of the 1957 statutes dealing with civil discovery, our courts lack the power to order discovery beyond that permitted by the statutes. (*Edmiston v. Superior Court* (1978) 22 Cal.3d 699, 704 [150 Cal.Rptr. 276, 586 P.2d 590]; *Holm v. Superior Court* (1986) 187 Cal.App.3d 1241, 1247 [232 Cal.Rptr. 432].)

■ A guardian ad litem is an officer of the court but also an agent of the party represented. (E.g., *Sarracino v. Superior Court* (1974) 13 Cal.3d 1, 13 [118 Cal.Rptr. 21, 529 P.2d 53] [guardian ad litem is both the incompetent's representative of record and a representative of the court]; *In re Christina B.* (1993) 19 Cal.App.4th 1441, 1453 [23 Cal.Rptr.2d 918] [guardian ad litem serves as an agent or representative of the ward and as an officer of the court].) Therefore, an easy answer to the issue posed is to hold that mother's status as guardian ad litem permits the court to order the examination under section 2032 (a)(2).

There are at least two problems with this analysis. Although mother's genetic condition is in controversy, that condition is unrelated to her status as guardian ad litem. Moreover, were we to hold that mother's duty to provide blood is based on her status as guardian ad litem, she could readily resign that office and have another guardian substituted as soon as we issue the remittitur. To affirm the trial court's order under these circumstances would in all probability be an idle act on our part.

■ But, while mother as guardian ad litem acts as her son's agent, this does not limit her status to that legal capacity. Although we normally do not view the relationship between minor children and their parents as a principal-agent relationship, under many circumstances parents, in fact, act on behalf of their children in a capacity difficult to distinguish from that of an agent. As OBGYN points out, mother, by virtue of her status as such, acts on plaintiff's behalf well beyond her capacity as guardian ad litem. OBGYN furnishes us with a number of United States Supreme Court cases that leave no doubt of parents' fundamental right to make decisions on behalf of their children, a right protected under the United States Constitution. (See, e.g., *Troxel v. Granville* (2000) 530 U.S. 57, 66 [147 L.Ed.2d 49, 120 S.Ct. 2054]; *Santosky v. Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 102 S.Ct. 1388]; *Pierce v. Society of Sisters* (1925) 268 U.S. 510, 534–535 [69 L.Ed. 1070, 45 S.Ct. 571].) Parents make decisions on behalf of their minor children which bind the children and, by virtue of their exercise of parental rights, they act as if they were their children's agents.

■ Mother argues, in response, that there cannot be an agency relationship absent a principal's right to control the acts of the agent; because children lack this right in relation to their parents, the argument goes, they cannot be their parents' principals. This argument is technically correct. (See, e.g., 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 33, p. 47.) But the relationship bears a significant similarity to that of principal and agent. For example, parents contracting for medical services for their minor children, do so " 'solely as a surrogate for the minor child.' " (*Bro v. Glaser* (1994) 22 Cal.App.4th 1398, 1419 [27 Cal.Rptr.2d 894], disapproved

on another ground in *Wooden v. Raveling* (1998) 61 Cal.App.4th 1035, 1037 [71 Cal.Rptr.2d 891].) And a parent can bind a minor child to a contract to arbitrate. (See, e.g., *Pietrelli v. Peacock* (1993) 13 Cal.App.4th 943, 947 [16 Cal.Rptr.2d 688].) Considering the purposes of the discovery statutes, we interpret the term "agent" in section 2032, subdivision (a) as being sufficiently broad to include mother under the facts of this case.

We do not hold that a parent is always to be treated as the child's agent for discovery purposes. But here mother and plaintiff were contemporaneously under the care of OBGYN, and plaintiff's malpractice claim includes charges that his injury resulted in part from the manner in which OBGYN treated mother during her pregnancy and plaintiff's delivery. Furthermore, in her capacity as plaintiff's mother, she has a definable economic interest in the outcome of the suit. If plaintiff is successful in obtaining a monetary award, mother's financial burdens resulting from her duty to care for plaintiff will be lessened.

*There Is No Evidence the Procedure Would Be "Painful, Protracted, or Intrusive"*

Wilcox's declaration provided evidence that, because of plaintiff's physical and mental condition, drawing his blood would involve peculiar risks and problems. But there is no evidence that obtaining blood from mother would be other than a routine procedure.

*Blood Testing Under Section 2032 Is Not Limited to Determining a Child's Blood Group*

Section 2032, subdivision (a) authorizes physical examinations "in any action in which the . . . physical condition (including the blood group)" is in controversy. Citing no authority, mother wants us to read the clarification "including" to mean "limited to." This argument borders on the frivolous. If the statute were limited to testing for blood groups, it would say so. And we need not cite authority for the self-evident proposition that the word "including" is not a synonym for "limited to."

*In Granting the Motion the Trial Court Did Not Abuse Its Discretion*

OBGYN filed motions to compel medical examinations before the motion under consideration here; those motions raised some of the same issues as the instant motion. The first of these motions was taken off calendar; the second was denied without prejudice. In connection with these earlier motions, the trial court ordered the deposition of both parties' experts, Graham and Wilcox, on the issue of whether plaintiff's physical and mental condition was

such as to make the drawing of blood too dangerous or painful. Plaintiff started Graham's deposition, but terminated it when OBGYN's lawyer objected to certain questions and instructed the witness not to answer. Mother now argues this violated the court's order that OBGYN produce Graham for his deposition and that hence the order that mother's blood be drawn was an abuse of discretion.

This argument fails for at least two reasons. The subject of the depositions was plaintiff's condition and whether it would interfere with the withdrawal of blood in a reasonable manner. It did not pertain to the order that mother's blood be tested. Secondly, Graham was produced for his deposition. There was a dispute about the appropriate scope of the examination. The discovery statutes provide procedures to resolve such disputes. (§ 2025, subd. (o).) If plaintiff deemed the questions which Graham failed to answer were properly within the scope of the examination, he should have sought a court order, and sanctions if appropriate. He did neither. The code does not authorize the kind of tit-for-tat ploys mother urges here.

*Defendants Supported Their Motion With Admissible Evidence*

■ Finally, mother argues "defendants failed to support their request for involuntary medical examination and testing with admissible evidence." The thrust of the argument is that Graham's reasons for conducting the blood tests were speculative. The only authority cited by either party in connection with this issue is *Kelley v. Trunk* (1998) 66 Cal.App.4th 519 [78 Cal.Rptr.2d 122], which dealt with the standards for expert declarations submitted in support of a motion for summary judgment. Hardly relevant here. The standards for discovery are quite different from the standards for summary judgment, and the rules governing what is relevant evidence to support a motion for summary judgment do not govern relevancy with respect to evidence supplied in support of a discovery motion. Although mother's briefs do not use the term "fishing expedition," the argument that OBGYN's reasons for wanting the discovery is based on speculation as to the cause of plaintiff's injuries amounts to an argument that OBGYN's discovery efforts constitute such an endeavor.

But "for discovery purposes, information is relevant if it 'might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement . . . .' [Citation.] Admissibility is not the test and information, unless privileged, is discoverable if it might reasonably lead to admissible evidence. [Citation.] These rules are applied liberally in favor of discovery [citation], and (contrary to popular belief), fishing expeditions are permissible in some cases. [Citation.]" (*Gonzalez v. Superior Court* (1995) 33

Cal.App.4th 1539, 1546 [39 Cal.Rptr.2d 896], italics omitted; see also *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 712, fn. 8 [10 Cal.Rptr.3d 724].)

## DISPOSITION

The petition is denied. Real parties shall recover their costs incurred in these proceedings.

Sills, P. J., and Ikola, J., concurred.

A petition for a rehearing was denied September 9, 2004, and petitioner's petition for review by the Supreme Court was denied November 17, 2004. Brown, J., did not participate therein.